IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

**Ruth Akers** and **Sharon Moesel,** on behalf of themselves and others similarly situated; **Sharon Moesel**, on behalf of herself and others similarly situated,

    Plaintiffs,

v.

**Maryland State Education Association**, et al.,

    Defendants.

Case No. 1:18-cv-01797-RDB

# RESPONSE TO THE UNION DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT

JONATHAN F. MITCHELL*
Mitchell Law PLLC
106 East Sixth Street, Suite 900
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

RADA A. MACHIN
D. Md. Bar No. 20076
The Machin Law Firm, LLC
One Research Court, Suite 450
Rockville, Maryland 20850
(301) 731-2000 (phone)
(301) 731-2000 (fax)
rada@machinlawfirm.com

*Counsel for Plaintiffs and
the Proposed Class*

* admitted *pro hac vice*

# TABLE OF CONTENTS

Table of contents ........................................................................................................i

Table of authorities ..................................................................................................iii

I. The Plaintiffs' claims for prospective relief against the collection of representation fees are not moot because a defendant's voluntary cessation of unconstitutional conduct in response to a Supreme Court ruling does not moot a claim for prospective relief ...............................................................................................1

    A. The Union defendants are wrong to say that *Janus* "changed[] . . . the law" .....2

        1. Same-sex marriage ...............................................................................3

        2. Partial-birth abortion ............................................................................4

        3. Sex-offender access to social-networking web sites ............................5

    B. *Janus* did not impose any legal obligations on the defendants in this case because they were not parties to that case .........................................................7

    C. None of the cases that the unions cite supports their mootness argument .........8

    D. The district-court rulings in *Danielson* and *Yohn* were decided incorrectly and are contrary to the weight of authority......................................................11

    E. The unions cannot establish mootness by relying on the state defendants' refusal to enforce agency shops in response to *Janus*........................................13

II. The Court cannot dismiss the refund claims at this stage of the litigation based on the supposed "good-faith defense" .................................................................14

    A. *Wyatt v. Cole* forbids a good-faith defense when the most analogous common-law tort rejects any consideration of the tortfeasor's state of mind .....15

    B. The union defendants misrepresent the Supreme Court's opinions in *Wyatt v. Cole* and *Richardson v. McKnight* ...............................................................18

    C. The unions' appeal to "principles of equality and fairness" does not support a good-faith defense for public-employee unions ...........................................20

    D. Even if one assumes that the union can assert a good-faith defense to a conversion-like constitutional tort, the union cannot establish good faith unless it presents evidence of its officers' subjective state of mind....................23

    E. The union defendants' reliance on Maryland's agency-shop statutes is not a defense to liability under 42 U.S.C. § 1983....................................................25

    F. The union defendants have not proven that they complied with pre-*Janus* case law ...........................................................................................................28

    G. The union's good-faith defense does not confer immunity from recovery for restitution and unjust enrichment ...........................................................29

III. The plaintiffs have stated a claim for a refund under state law...............................30

IV. The plaintiffs have standing to seek relief against the enforcement of House Bill 811, and they have stated a claim against the statute's enforcement ...............32

   A.  The plaintiffs have standing to challenge to House Bill 811 ...........................32

   B.  The plaintiffs have stated a claim against the enforcement of House Bill 811 ...................................................................................................34

      1.  HB 811's compelled-disclosure requirements are subject to "exacting scrutiny" ...................................................................................................34

      2.  The compelled disclosure of anti-union employees' home addresses, home phone numbers, and personal cell-phone numbers cannot survive "exacting scrutiny" because it remains possible to establish equally effective channels of communication without forcing schools to disclose this personal contact information ..............................................................36

V. The plaintiffs' constitutional challenges to exclusive representation should be dismissed given the Supreme Court's holding in *Knight* ........................39

VI. Ms. Moesel has stated an antitrust claim ............................................40

   A.  The state-action immunity doctrine cannot support dismissal under Rule 12(b)(6) ...................................................................................................40

   B.  The *Noerr-Pennington* doctrine cannot support dismissal under Rule 12(b)(6) ...................................................................................................42

   C.  The statutory labor exemption cannot support dismissal under Rule 12(b)(6) ...................................................................................................43

Conclusion ...................................................................................................44

Certificate of service ...................................................................................45

# TABLE OF AUTHORITIES

## Cases

*Abood v. Detroit Board of Education,* 431 U.S. 209 (1977)...................... 3, 22, 26, 28, 29

*Anheuser-Busch, Inc. v. Local Union No. 744, Int'l Bhd. of Teamsters,*
   280 F.3d 1133 (7th Cir. 2002)...................................................21

*Bank Markazi v. Peterson,* 136 S. Ct. 1310 (2016).....................................22

*Bell v. City of Boise,* 709 F.3d 890 (9th Cir. 2013)..........................................11

*Bierman v. Dayton,* 900 F.3d 570 (8th Cir. 2018) ..........................................40

*Blonder-Tongue Lab., Inc. v. Univ. of Ill. Found.,* 402 U.S. 313 (1971) ...........................7

*Brown & Pipkins, LLC v. Serv. Employees Int'l Union,*
   846 F.3d 716 (4th Cir. 2017)....................................................1

*Brown v. Pro Football Inc.,* 518 U.S. 231 (1996) ..........................................43

*Brown v. Socialist Workers '74 Campaign Comm.,* 459 U.S. 87 (1982)...........................35

*Campaign for Southern Equality v. Bryant,* 791 F.3d 625 (5th Cir. 2015) .................4, 12

*Campbell-Ewald Co. v. Gomez,* 136 S. Ct. 663 (2016).....................................1

*Chicago, Indianapolis, & Louisville Ry. Co. v. Hackett,* 228 U.S. 559 (1913)..................31

*Christian Coalition v. Cole,* 355 F.3d 1288 (11th Cir. 2004) .....................................9, 10

*City of Mesquite v. Aladdin's Castle, Inc.,* 455 U.S. 283 (1982) ........................................2

*Clement v. City of Glendale,* 518 F.3d 1090 (9th Cir. 2008)...........................................17

*Cost Mgmt. Servs., Inc. v. Washington Nat. Gas Co.,*
   99 F.3d 937 (9th Cir. 1996)....................................................40, 41

*County of Los Angeles v. Los Angeles County Employee Relations Comm'n,*
   301 P.3d 1102 (Cal. 2013)......................................................37

*Danielson v. Inslee,* No. 3:18-cv-05206-RJB (W.D. Wash.) ...............................11, 12, 13

*Darcars Motors of Silver Spring, Inc. v. Borzym,* 841 A.2d 828 (Md. 2004) .....................32

*De Leon v. Abbott,* 791 F.3d 619 (5th Cir. 2015) .......................................................4, 12

*Diamond, et al. v. Pennsylvania State Education Ass'n, et al.,*
   No. 3:18-cv-00128-KRG......................................................6

*Doe v. Kentucky ex rel. Tilley,* 283 F. Supp. 3d 608 (E.D. Ky. 2017).......................5, 6, 13

*Franklin v. Fox,* 2001 WL 114438 (N.D. Cal.) ..........................................20, 24

*Friedrichs v. California Teachers Association,* 136 S. Ct. 1083 (2016) ...........................26

*FTC v. Phoebe Putney Health Sys., Inc.,* 568 U.S. 216 (2013) ...........................................40

*FTC v. Ticor Title Ins. Co.,* 504 U.S. 621 (1992)...........................................................41

*Global Relief Foundation, Inc. v. O'Neill,* 315 F.3d 748 (7th Cir. 2002)...........................1

*Gomez v. Toledo,* 446 U.S. 635 (1980) ...........................................................25

*Harper v. Virginia Dep't of Taxation,* 509 U.S. 86 (1993) ...........................2, 14, 27, 30

*Harris v. Quinn,* 134 S. Ct. 2618 (2014)...................................................18, 26

*Hoffman v. Inslee,*
   No. 14-CV-200 (MJP), 2016 WL 6126016 (W.D. Wash. Oct. 20, 2016)..................18

*Hope Clinic v. Ryan*, 249 F.3d 603 (7th Cir. 2001) .............................................................5

*Janus v. Am. Fed'n of State, Cty., & Mun. Employees, Council 31*,
   138 S. Ct. 2448, 2478 (2018) ................................................................passim

*Jarvis v. Cuomo*, 660 F. App'x 72 (2d Cir. 2016) ........................................................18

*Jernigan v. Crane*, 796 F.3d 976 (8th Cir. 2015) ....................................................8, 12

*Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250 (3d Cir. 1994) .................23

*Keys v. Chrysler Credit Corp.*, 494 A.2d 200 (Md. 1985) .......................................30, 31

*Knight v. Minnesota Community College Faculty Association*,
   460 U.S. 1048 (1983) ................................................................................39

*Knox v. Service Employees Int'l Union, Local 1000*, 567 U.S. 311 (2012) ...................26, 33

*Landgraf v. USI Film Products*, 511 U.S. 244 (1994) ..................................................22

*Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*,
   507 U.S. 163, 164 (1993) ..........................................................................24

*Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982) ................................................14, 19

*Marcavage v. Nat'l Park Serv.*, 666 F.3d 856, 861 (3d Cir. 2012) .............................8, 10

*Martin v. Wilks*, 490 U.S. 755 (1989) ........................................................................7

*Massachusetts v. EPA*, 549 U.S. 497 (2007) ..............................................................33

*Mine Workers v. Pennington*, 381 U.S. 657 (1965) ......................................................42

*Minnesota State Board for Community Colleges v. Knight*,
   465 U.S. 271 (1984) ................................................................................39

*Mokdad v. Sessions*, 876 F.3d 167 (6th Cir. 2017) .......................................................8

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010) .........................................33

*Morissette v. United States*, 342 U.S. 246 (1952) .......................................................16

*Mountain States Legal Foundation v. Glickman*,
   92 F.3d 1228 (D.C. Cir. 1996) ..................................................................33

*N.C. State Bd. of Dental Examiners v. FTC*, 135 S. Ct. 1101 (2015) .......................40, 41

*NAACP v. Alabama*, 357 US 449 (1958) ...................................................................35

*Nickens v. Mount Vernon Realty Group, LLC*, 54 A.3d 742 (Md. 2012) ...................16, 32

*Norton v. Shelby County*, 118 U.S. 425 (1886) ..........................................................30

*Obergefell v. Hodges*, 135 S. Ct. 2584 (2015) .............................................................8

*Otto v. Pa. State Educ. Ass'n–NEA*, 330 F.3d 125 (3d Cir. 2003) ................................28

*Owen v. City of Independence*, 445 U.S. 622 (1980) ...............................................20, 21

*Packingham v. North Carolina*, 137 S. Ct. 1730 (2017) ................................................5

*Pinsky v. Duncan*, 79 F.3d 306 (2d Cir. 1996) ...........................................................17

*Republican Party of Minnesota v. White*, 536 U.S. 765 (2002) .......................................9

*Richardson v. McKnight*, 521 U.S. 399 (1997) .....................................................18, 19

*Robicheaux v. Caldwell*, 2015 WL 4090353 (E.D. La. July 2, 2015) ...............................4

*Robinson v. City of San Bernardino Police Dep't*,
   992 F. Supp. 1198 (C.D. Cal. 1998) ...........................................................24

*Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477 (1989) ...................39, 42

*Rosebrock v. Mathis*, 745 F.3d 963 (9th Cir. 2014)............................................................11

*Rosenbrahn v. Daugaard*, 799 F.3d 918 (8th Cir. 2015)..............................................4, 12

*Sage Title Grp., LLC v. Roman*, 166 A.3d 1026 (Md. 2017) .............................................31

*SEC v. Chenery Corp.*, 332 U.S. 194 (1947).....................................................................22

*Smith v. University of Washington,* 233 F.3d 1188 (9th Cir. 2000) ....................................8

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998) ..............................................4

*Stenberg v. Carhart*, 530 U.S. 914 (2000).........................................................................4

*Strawser v. Strange*, 190 F. Supp. 3d 1078 (S.D. Ala. 2016)......................................4, 12

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) .....................................................35, 36

*Trump v. Hawaii*, 138 S. Ct. 2392 (2018)..........................................................................36

*U.S. Dep't of the Treasury, Bureau of Alcohol, Tobacco and Firearms v. Galioto,*
      477 U.S. 556 (1986).............................................................................................3

*United States v. Figueroa-Ocampo*, 494 F.3d 1211 (9th Cir. 2007)....................................1

*United States v. Monsanto Co.*, 858 F.2d 160 (4th Cir. 1988).........................................22

*United States v. W.T. Grant Co.*, 345 U.S. 629 (1953).......................................................2

*United States v. Northern Trust Co.*, 372 F.3d 886 (7th Cir. 2004) ...........................25, 40

*Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1 (1976)..................................................22

*Valero Terrestrial Corp. v. Paige*, 211 F.3d 112 (4th Cir. 2000) ......................................3

*Waters v. Ricketts*, 159 F. Supp. 3d 992 (D. Neb. 2016) ..................................................4

*Waters v. Ricketts*, 798 F.3d 682 (8th Cir. 2015) .......................................................4, 12

*Waugh Chapel South, LLC v. United Food and Commercial Workers Union
      Local 27*, 728 F.3d 354 (4th Cir. 2013) ...........................................................40, 42

*White v. Lee*, 227 F.3d 1214 (9th Cir. 2000)) ...................................................................11

*Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016)........................................34

*Will v. Mich. Dep't of State Police*, 491 U.S. 58 (1989) ...................................................20

*Winner v. Rauner,*
      No. 15 CV 7213, 2016 WL 7374258 (N.D. Ill. Dec. 20, 2016).........................18

*Winsness v. Yocom*, 433 F.3d 727 (10th Cir. 2006).........................................................11

*Wisconsin Right to Life v. Schober*, 366 F.3d 485 (7th Cir. 2004) ...................................11

*Wood v. Strickland,* 420 U.S. 308 (1975)..........................................................................29

*Wyatt v. Cole*, 504 U.S. 158, 164 (1992)....................................................................14, 16

*Wyatt v. Cole*, 994 F.2d 1113, 1118 (5th Cir. 1993).....................................................17, 23

*Yohn v. California Teachers Ass'n,*
      No. 8:17-cv-00202-JLS-DFM (C.D. Cal.), ECF No. 198..............................11, 13

## Statutes

15 U.S.C. § 1 ....................................................................................................................44

15 U.S.C. § 17 ..................................................................................................................43

Cal. Gov't Code § 6207......................................................................................................38

Cal. Gov't Code § 6254.3 (a)(3).........................................................................................38

Cal. Gov't Code § 6254.3(c) ........................................................38

**Other Authorities**

Phillip Areeda & Donald F. Turner, Antitrust Law 21 (1980) ...........................21

William Baude & Eugene Volokh, *Compelled Subsidies and the First
    Amendment*, 132 Harv. L. Rev. 171 (2018).................................................18

Paul N. Cox, *Reflections on Ex Ante Compensation and Diversification of Risk
    As Fairness Justifications for Limiting Fiduciary Obligations of Corporate
    Officers, Directors, and Controlling Shareholders*, 60 Temp. L.Q. 47, 90
    (1987)..........................................................................................21

Richard A. Epstein, Torts § 1.12.1 (1999) ...................................................16

Noah Feldman, *Cosmopolitan Law?*, 116 Yale L.J. 1022 (2007) .........................22

Edward A. Hartnett, *A Matter of Judgment, Not A Matter of Opinion*, 74
    N.Y.U. L. Rev. 123 (1999).................................................................7

Thomas W. Merrill, *Judicial Opinions as Binding Law and as Explanations
    for Judgments*, 15 Cardozo L. Rev. 43 (1993)............................................7

Richard S. Murphy, Erin A. O'Hara, *Mistake of Federal Criminal Law: A
    Study of Coalitions and Costly Information*, 5 Sup. Ct. Econ. Rev. 217
    (1997)..........................................................................................25

**Rules**

Fed. R. Civ. P. 12(b)(6).......................................................................24

Fed. R. Civ. P. 56(d) ..........................................................................24

The claims for prospective relief are not moot because a defendant's voluntary cessation of unlawful conduct does not moot an Article III case or controversy. The union defendants' "good faith" defense is foreclosed by *Wyatt v. Cole*, 504 U.S. 158, 161 (1992), and even apart from *Wyatt* the unions cannot establish a good-faith defense under the facts of this case.

I.  **THE PLAINTIFFS' CLAIMS FOR PROSPECTIVE RELIEF AGAINST THE COLLECTION OF REPRESENTATION FEES ARE NOT MOOT BECAUSE A DEFENDANT'S VOLUNTARY CESSATION OF UNCONSTITUTIONAL CONDUCT IN RESPONSE TO A SUPREME COURT RULING DOES NOT MOOT A CLAIM FOR PROSPECTIVE RELIEF**

The claims for prospective relief are not moot because it remains possible for this Court to enter the declaratory and injunctive relief that the plaintiffs request. Maryland has not repealed or amended its agency-shop laws in response to *Janus*, and the unions have not amended or renegotiated the collective-bargaining agreements that require the collection of agency fees. So it is still possible for this Court to declare those statutes and bargaining agreements unconstitutional and enjoin the unions from enforcing them. *See Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 669 (2016) ("A case becomes moot . . . only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." (citation and internal quotation marks omitted)); *Brown & Pipkins, LLC v. Serv. Employees Int'l Union*, 846 F.3d 716, 728 (4th Cir. 2017) (same); *Global Relief Foundation, Inc. v. O'Neill*, 315 F.3d 748, 751 (7th Cir. 2002) ("When relief is possible, a lawsuit is not moot."); *United States v. Figueroa-Ocampo*, 494 F.3d 1211, 1217 (9th Cir. 2007) ("[T]he possibility of relief is sufficient to prevent mootness.").

Even if this Court were to conclude that judicial relief is no longer possible because the unions have promised to stop collecting the unconstitutional representation fees, that *still* would not moot the plaintiffs' claims because a defendant's "voluntary cessation" of unlawful conduct does not moot a claim for declaratory or injunctive relief. *See City of Mesquite v.*

*Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982) ("It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice."); *United States v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953) ("[V]oluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, *i.e.*, does not make the case moot."); *Porter v. Clarke*, 852 F.3d 358 (4th Cir. 2017) (same). The union defendants were enforcing an unconstitutional agency shop when the plaintiffs sued, and they stopped while the litigation was ongoing. That is the very definition of "voluntary cessation"—and it does not moot the plaintiffs' claims for prospective relief.

The unions do not deny that they "ceased" enforcing the challenged statutes during the litigation. But they deny that their cessation of this unconstitutional conduct was "voluntary." *See* ECF No. 75-1 at 8–11. None of the unions' arguments have merit.

### A.     The Union Defendants Are Wrong To Say That *Janus* "Changed[] . . . The Law"

The unions first contend that their response to *Janus* was compelled by a "change in the law," which cannot be regarded as "voluntary." *See* ECF No. 75-1 at 8 ("[W]hen a defendant changes its position in response to a change in the law, the cessation of the challenged conduct is not considered 'voluntary' for purposes of mootness analysis."). The unions are correct to observe that a "change in the law" can rebut a claim of voluntary cessation, but they are wrong to say that *Janus* changed the law when it overruled *Abood*.

Courts do not make or change laws; they interpret and discover the meaning of laws enacted by others. That is why the Supreme Court always gives retroactive effect to rulings that interpret the Constitution or federal statutes, including rulings that overrule its earlier precedents. *See Harper v. Virginia Dep't of Taxation*, 509 U.S. 86, 96 (1993) ("[A] rule of federal law, once announced and applied to the parties to the controversy, must be given full retroactive effect by all courts adjudicating federal law."). *Janus* did not "change" the law

when it overruled *Abood v. Detroit Board of Education*, 431 U.S. 209 (1977); it simply recognized that the Constitution had prohibited public-sector agency shops all along and that *Abood* had misinterpreted the Constitution from the get-go. *See Janus v. Am. Fed'n of State, Cty., & Mun. Employees, Council 31*, 138 S. Ct. 2448, 2460 (2018) ("*Abood* was poorly reasoned."); *id.* at 2469 (acknowledging "the weakness of *Abood*'s own reasoning"); *id.* at 2479–81 (describing the many ways in which "*Abood* was not well reasoned"). An actual change in the law—such as a constitutional amendment outlawing public-sector agency shops or a repeal of the statutes that authorized this practice—would moot the plaintiffs' claims for injunctive relief. *See U.S. Dep't of the Treasury, Bureau of Alcohol, Tobacco and Firearms v. Galioto*, 477 U.S. 556 (1986) (holding that a case becomes moot if Congress amends the statute to remove the challenged provision); *Valero Terrestrial Corp. v. Paige*, 211 F.3d 112, 116 (4th Cir. 2000) ("[S]tatutory changes that discontinue a challenged practice are 'usually enough to render a case moot, even if the legislature possesses the power to reenact the statute after the lawsuit is dismissed.'" (quoting *Native Village of Noatak v. Blatchford*, 38 F.3d 1505, 1510 (9th Cir. 1994)). But voluntary cessation in response to an intervening Supreme Court decision in a case involving other parties does not moot ongoing litigation—as numerous cases have established.

### 1.     Same-Sex Marriage

The judicial response to *Obergefell v. Hodges*, 135 S. Ct. 2584 (2015), proves as much. When the Supreme Court announced its ruling in *Obergefell*, several States were litigating the constitutionality of their marriage laws in the lower federal courts. All of those States promptly complied with *Obergefell* and starting issuing marriage licenses to same-sex couples—but that did not moot the ongoing constitutional challenges to the states' marriage laws. *See, e.g., Jernigan v. Crane*, 796 F.3d 976, 979 (8th Cir. 2015) (refusing to hold that a constitutional challenge to Arkansas's marriage laws had become moot after *Obergefell*, because *Obergefell* had "invalidated laws in Michigan, Kentucky, Ohio, and Tennessee—not

Arkansas."); *Rosenbrahn v. Daugaard*, 799 F.3d 918, 922 (8th Cir. 2015) ("South Dakota's assurances of compliance with *Obergefell* do not moot the case."); *Waters v. Ricketts*, 798 F.3d 682, 686 (8th Cir. 2015) ("Nebraska's assurances of compliance with *Obergefell* do not moot the case."); *Waters v. Ricketts*, 159 F. Supp. 3d 992, 999–1000 (D. Neb. 2016) (refusing to find the plaintiffs' constitutional challenge to Nebraska's laws moot because "no Court has yet declared Section 29 unconstitutional. . . . It has not been repealed and is still published as part of the Nebraska Constitution. . . . The *Obergefell* case struck down the marriage exclusions in Michigan, Kentucky, Ohio, and Tennessee. While precedent does in fact dictate the result in the case before this Court, Section 29 has not specifically been declared unconstitutional."); *Strawser v. Strange*, 190 F. Supp. 3d 1078, 1081 (S.D. Ala. 2016) ("[A] government ordinarily cannot establish mootness just by promising to sin no more." (citation and internal quotation marks omitted)).

Many other post-*Obergefell* rulings directed entry of judgment for the plaintiffs without even discussing the issue of mootness. *See, e.g.*, *De Leon v. Abbott*, 791 F.3d 619, 625 (5th Cir. 2015) (remanding "for entry of judgment in favor of the plaintiffs"); *Campaign for Southern Equality v. Bryant*, 791 F.3d 625, 627 (5th Cir. 2015) (directing the district court to enter judgment for the plaintiffs challenging the constitutionality of Mississippi's marriage laws); *Robicheaux v. Caldwell*, 2015 WL 4090353, at *1–2 (E.D. La. July 2, 2015) (issuing an injunction against the enforcement of Louisiana's marriage laws rather than declaring the case moot). Although these cases do not establish precedential holdings on the mootness issue, *see Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 91 (1998), the union defendants would still have to show that these courts erred by failing to moot the claims *sua sponte* in response to *Obergefell*.

## 2. Partial-Birth Abortion

The judicial response to *Stenberg v. Carhart*, 530 U.S. 914, 939 (2000), likewise shows that constitutional challenges to state laws do not become moot when the Supreme Court

disapproves a similar or identical law in another state. After *Stenberg* declared Nebraska's partial-birth abortion ban unconstitutional, the en banc Seventh Circuit enjoined the enforcement of Illinois's and Wisconsin's partial-birth abortion bans, even though both States had *conceded* that their statutes were unconstitutional and unenforeable in light of *Stenberg*. *See Hope Clinic v. Ryan*, 249 F.3d 603, 604 (7th Cir. 2001) (en banc) ("[B]oth Illinois and Wisconsin have conceded that their partial-birth-abortion statutes are unconstitutional under the approach the Court adopted in *Stenberg*. We agree with this assessment of *Stenberg*'s significance."). Yet rather than declaring the constitutional challenges moot on account of *Stenberg* and the States' concessions, the en banc court enjoined the state defendants from enforcing the statutes and directed entry of judgment for the plaintiffs. *See id*. at 606 ("In *Hope Clinic* the judgment is affirmed to the extent it enjoins enforcement of 720 ILCS 513/10, the criminal prohibition of partial-birth abortions. . . . In *Christensen* the judgment of the district court is vacated, and the case is remanded with instructions to enjoin the defendants from enforcing Wis. Stat. § 40.16, Wisconsin's criminal prohibition of partial-birth abortions.").

### 3. Sex-Offender Access To Social-Networking Web Sites

In *Packingham v. North Carolina*, 137 S. Ct. 1730 (2017), the Supreme Court disapproved a statute that prohibited registered sex offenders from accessing social networking web sites. *See id*. at 1733–34 (describing North Carolina's statute). Before the Supreme Court announced its decision in *Packingham*, a similar lawsuit had been brought against a nearly identical Kentucky statute. *See Doe v. Kentucky ex rel. Tilley*, 283 F. Supp. 3d 608 (E.D. Ky. 2017). The district court in Kentucky stayed its proceedings to await the Supreme Court's ruling in *Packingham*. *See id*. at 611.

After *Packingham*, the state defendants in *Doe conceded* that Kentucky's statute was unconstitutional and unenforceable given the ruling in *Packingham*:

Defendant John Tilley, Secretary of the Justice and Public Safety Cabinet, concedes that Kentucky's restriction on sex offender registrants' use of social media websites is unconstitutional in the wake of *Packingham*. Secretary Tilley explains that, while he considers Kentucky's sex offender restrictions to be important tools to protect the children of the Commonwealth from abuse, the North Carolina statute struck down by the Supreme Court was even more narrowly tailored than KRS § 17.546(2).

*Doe*, 283 F. Supp. 3d at 612 (citation omitted). Yet the district court refused to declare that the plaintiff's claims for prospective relief against Secretary Tilley and the State had become moot. Instead, the Court entered a permanent injunction against the state defendants. *See id.* at 616 ("[T]he Court hereby ORDERS that Plaintiff John Doe's motion for a permanent injunction is GRANTED. The Commonwealth is permanently enjoined from enforcing KRS §§ 17.546 and 17.510(10), (13) in light of the unconstitutional restrictions those statutes place on the First Amendment rights of sex offenders.").[1]

* * *

None of these cases can be reconciled with the unions' argument—and each of them shows that the cessation of unconstitutional conduct in response to a Supreme Court decision is incapable of mooting a claim for prospective relief.[2]

---

1. The county defendants in *Doe* continued to defend the constitutionality of the Kentucky statute and sought to distinguish it from the law that the Supreme Court had disapproved. *See Doe v. Kentucky ex rel. Tilley*, 283 F. Supp. 3d 608, 612 (E.D. Ky. 2017) ("Defendants Lou Anna Red Corn and Larry Roberts, Fayette County's Commonwealth and County Attorneys, do not share Secretary Tilley's view and attempt to distinguish KRS § 17.546(2) from the unconstitutional North Carolina law."). But that cannot justify the district court's injunction against "the Commonwealth," which is logically incompatible with the union defendants' mootness argument in this case.

2. In another case, the unions' attorneys have suggested that the post-*Obergefell* cases included some issues that *Obergefell* had not explicitly resolved, and that this was why the post-*Obergefell* courts refused to declare the claims moot. *See Diamond, et al. v. Pennsylvania State Education Ass'n, et al.*, No. 3:18-cv-00128-KRG, ECF No. 51 at 1–2 ("The three per curiam decisions of the Eighth Circuit . . . declined to vacate preliminary injunctions issued by the district courts before *Obergefell* was decided, which *inter alia* addressed issues not decided in *Obergefell*."). But even if that were the case, those courts should have *still* mooted the constitutional challenges to the states' refusals to license and

**B.** *Janus* **Did Not Impose Any Legal Obligations On The Defendants In This Case Because They Were Not Parties To That Case**

There is yet another problem with the unions' argument against voluntary cessation: The ruling in *Janus* does not impose any legal obligations on the state or union defendants in this case. None of them were parties to the *Janus* litigation, and they have no formal legal obligation to obey a court judgment that was entered in a case that they were not involved in. Judicial rulings bind only the named parties to the litigation,[3] and Supreme Court opinions do not create self-executing legal obligations unless and until a court enters a judgment that enforces the Supreme Court's interpretation of the Constitution.[4] It would be legal for the union defendants to continue enforcing their agency shops laws after *Janus* until a litigant sues them to enjoin the practice. The unions chose to conform to their conduct to *Janus* without awaiting a court directive, but no statute or court judgment required them to do this.

So the unions are wrong to deny that their choice to comply with *Janus* was "voluntary"—and they are wrong to suggest that *Janus* compelled them to terminate their agency-shop arrangements. *See* ECF No. 75-1 at 8. The ruling and opinion in *Janus* did not impose

---

recognize marriages between same-sex couples, while leaving in place the claims for prospective relief on the peripheral issues that *Obergefell* had left unresolved (such as birth certificates and name changes on driver's licenses). Instead, the post-*Obergefell* courts refused to moot *any* of the claims for prospective relief—including the claims that had been unquestionably resolved by *Obergefell*. That stance cannot be reconciled with the unions' mootness argument in this case.

The unions' attorneys also tried to distinguish the post-*Obergefell* cases in *Diamond* by observing that the district courts had issued preliminary injunctions before *Obergefell* was decided, but that has nothing to do with whether a claim for prospective relief has been mooted by an intervening Supreme Court decision. *See id.*

3. *See Martin v. Wilks*, 490 U.S. 755 (1989); *Blonder-Tongue Lab., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 329 (1971).

4. *See, e.g.*, Edward A. Hartnett, *A Matter of Judgment, Not A Matter of Opinion*, 74 N.Y.U. L. Rev. 123, 126–27 (1999) ("The operative legal act performed by a court is the entry of a judgment; an opinion is simply an explanation of reasons for that judgment."); Thomas W. Merrill, *Judicial Opinions as Binding Law and as Explanations for Judgments*, 15 Cardozo L. Rev. 43, 62 (1993) ("[J]udicial opinions are simply explanations for judgments—essays written by judges explaining why they rendered the judgment they did.").

formal legal obligations on non-parties to that litigation, and the union defendants remain free to enforce their agency shops until a court enjoins them from doing so. *Janus* did not award any judicial relief to the plaintiffs in this case, nor did it issue the declaratory judgment or the injunction that the plaintiffs are seeking against the union defendants. It remains possible for this Court to grant the relief that the plaintiffs seek: a declaratory judgment that public-sector agency shops are unconstitutional and an injunction that prohibits the defendants from enforcing them. *See Jernigan v. Crane*, 796 F.3d 976, 979 (8th Cir. 2015) (refusing to hold that a constitutional challenge to Arkansas's marriage laws had become moot after *Obergefell v. Hodges*, 135 S. Ct. 2584 (2015), because *Obergefell* had "invalidated laws in Michigan, Kentucky, Ohio, and Tennessee—not Arkansas."). *Janus* did not provide any of this relief, and neither the ruling nor the opinion in *Janus* has any self-executing effect on the defendants in this case.

## C. None of the Cases That The Unions Cite Supports Their Mootness Argument

The union defendants cite several appellate-court decisions, but none of them helps the unions escape a finding of voluntary cessation or supports their claim for mootness in any way. In *Mokdad v. Sessions*, 876 F.3d 167 (6th Cir. 2017), the defendants changed their conduct in response to a court order directed at them. *See id*. at 171 ("The voluntary-cessation doctrine does not apply here because the government's actions were not voluntary. . . . [The defendants] thus made the determination that Mokdad is not currently on the No Fly List to comply with a court order—hardly a voluntary action."). In *Smith v. University of Washington,* 233 F.3d 1188 (9th Cir. 2000), the defendants were compelled to change their conduct in response to a new statutory enactment. *See id*. at 1194–95; *see also Galioto*, 477 U.S. 556 (holding that a case becomes moot if Congress amends the statute to remove the challenged provision). And in *Marcavage v. National Park Serv*., 666 F.3d 856 (3d Cir. 2012), the federal government complied with an earlier court's determination that a sidewalk

was a public forum—but that judicial determination had been made in a previous case involving the same litigants: Mr. Marcavage and the United States government. *See id*. at 857–58, 861. So the National Park Service was bound by collateral estoppel to regard the sidewalk as a public forum in any case involving Mr. Marcavage, which makes its acknowledgement of the sidewalk's public-forum status non-voluntary as applied to that individual.

Then there is *Christian Coalition v. Cole*, 355 F.3d 1288 (11th Cir. 2004), where a state Judicial Inquiry Commission issued an advisory opinion warning elected judges not to answer parts of a questionnaire distributed by the Christian Coalition of Alabama. The Christian Coalition sued to challenge the constitutionality of this advisory opinion, and while the litigation was unfolding the Supreme Court announced its ruling in *Republican Party of Minnesota v. White,* 536 U.S. 765 (2002), which held that the First Amendment gives elected judges the right to announce their views on disputed issues. In response to *White*, the Judicial Inquiry Commission withdrew its advisory opinion *and* the Alabama Supreme Court announced that it would revise the judicial canons on which the advisory opinion had been based. *See Christian Coalition*, 355 F.3d at 1290. The Eleventh Circuit declared the case moot, announcing that:

> The Supreme Court's decision in *White and the Alabama Supreme Court's Committee on the Canons' decision to reevaluate the Canons in light of White* changed the legal landscape on which the JIC initially based its Advisory Opinion. Thus, the CCA has every reason to believe that the JIC's representation is genuine, and can reasonably expect that the JIC will not issue another opinion preventing judges from answering the questionnaire at issue in this case.

*Christian Coalition*, 355 F.3d at 1292–93 (emphasis added).

*Christian Coalition* might support the unions if it had held that the intervening Supreme Court ruling in *White*, standing alone, was sufficient to "change[ ] the legal landscape" and produce a finding of mootness. *See* Dkt. No. 75-1 at 9. But that is not what the Eleventh Circuit held. It was the Supreme Court's ruling in *White—combined with* the Alabama Supreme Court's decision to revise the judicial canons that undergirded the advisory opinion—

that led the Eleventh Circuit to conclude that the Judicial Inquiry Commission's withdrawal of its opinion was not "voluntary" cessation, and was instead the "result of subsequent events out of the JIC's control." *Id*. at 1292; *see also* ECF No. 75-1 at 8–9 (acknowledging that the "intervening Supreme Court decision *and other events beyond defendants' control*" had "changed the legal landscape" and mooted the case). The union defendants, by contrast, are attempting to stave off voluntary cessation by relying *solely* on the intervening Supreme Court ruling in *Janus*, and neither *Christian Coalition*—nor any other appellate case of which we are aware—allows the mere compliance with an intervening Supreme Court ruling to moot a case. Indeed, the post-*Obergefell*, post-*Stenberg*, and post-*Packingham* cases disapprove that as a basis for mootness.

*Christian Coalition* is distinguishable in yet another respect: The defendants in that case were state officials, and government officials are presumed to act in good faith when they change their policies or practices in the course of litigation. *See Marcavage v. Nat'l Park Serv.*, 666 F.3d 856, 861 (3d Cir. 2012). Private litigants such as labor unions get no such indulgence from the courts, and they cannot moot a case without showing that it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Environmental Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (quoting *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203 (1968)). *Christian Coalition* did not even attempt to argue that this demanding standard had been met; because the defendants in that case were state officials, they were able to moot the case so long as the plaintiff could "reasonably expect that the [Judicial Inquiry Commission] will not issue another opinion preventing judges from answering the questionnaire at issue in this case." *Christian Coalition*, 355 F.3d at 1292–93. A case of that sort is no help to the union defendants, who bear the much heavier burden of showing that it is "absolutely clear that

the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth*, 528 U.S. at 189.[5]

**D.    The District-Court Rulings In *Danielson* And *Yohn* Were Decided Incorrectly And Are Contrary To The Weight Of Authority**

The unions rely on two district-court rulings that have accepted mootness arguments similar to those advanced by the defendants: *Danielson v. Inslee*, No. 3:18-cv-05206-RJB (W.D. Wash.), ECF No. 39, and *Yohn v. California Teachers Ass'n*, No. 8:17-cv-00202-JLS-DFM (C.D. Cal.), ECF No. 198. We respectfully submit that each of these rulings was decided incorrectly and in contravention of the authorities discussed in Parts I.A–C.

*Danielson* did not deny that the state defendants in that case had voluntarily ceased their unconstitutional behavior in response to *Janus*. *See Danielson v. Inslee*, No. 3:18-cv-05206-RJB (W.D. Wash.), ECF No. 39 at 5. But it ruled that a defendant's voluntary cessation of unlawful conduct can still moot a case "depending on whether the challenged [conduct] can be reasonably expected to recur." *Id.* (citing *Rosebrock v. Mathis*, 745 F.3d 963, 971 (9th Cir. 2014), *Bell v. City of Boise*, 709 F.3d 890, 899–901 (9th Cir. 2013), and *White v. Lee*, 227 F.3d 1214, 1242-44 (9th Cir. 2000)). The *Danielson* Court misstated the test for mootness. A defendant's voluntary cessation of allegedly unlawful conduct can moot a case only when "subsequent events *made it absolutely clear that* the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Environmental Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (emphasis added). And the burden of making this demanding showing "lies with the party asserting mootness." *Id.*; *see also Rosebrock*, 745 F.3d at 971 (reciting this test from *Friends of the Earth*); *Bell*, 709 F.3d at 898 (same); *White*, 227 F.3d at 1243 (same).

---

5.  The union defendants' citations of other cases in which *government officials* changed their conduct or promised not to enforce the challenged statute are unhelpful for the same reason. *See* ECF No. 75-1 at 11 (citing *Winsness v. Yocom*, 433 F.3d 727, 732–37 (10th Cir. 2006) and *Wisconsin Right to Life v. Schober*, 366 F.3d 485, 492 (7th Cir. 2004)). Government officials are presumed to act in good faith when they provide these assurances; private litigants are not.

Neither the state defendants in *Danielson* nor the union defendants in this case can carry this burden, because there is nothing to stop them from resurrecting the enforcement of agency shops if the composition of the federal judiciary changes or if Congress enacts legislation to deprive the Supreme Court of jurisdiction over *Janus*-related claims. *See* Article III, § 2, ¶ 2. The union defendants do not claim that their present-day non-enforcement policy is irreversible, and they do not deny that a future regime remains capable of restoring the pre-*Janus* payroll deductions given that the statutes have not been amended or repealed.

*Danielson* attempted to distinguish the post-*Obergefell* same-sex marriage cases on two grounds, neither of which is persuasive. First, *Danielson* claimed that the post-*Obergefell* cases rejected mootness because "there was reason to believe that some states would ignore the Supreme Court's binding precedent." *See Danielson v. Inslee*, No. 3:18-cv-05206-RJB (W.D. Wash.), ECF No. 39 at 6. The court cited no evidence to support this claim—and (more importantly) the post-*Obergefell* appellate-court rulings did not rely on this as a reason for rejecting mootness. *See, e.g.*, *Jernigan*, 796 F.3d at 979 (rejecting Arkansas's mootness argument without ever suggesting that state officials might defy *Obergefell*); *Rosenbrahn*, 799 F.3d at 922 (rejecting South Dakota's mootness argument without ever suggesting that state officials might defy *Obergefell*); *Waters*, 798 F.3d at 686 (8th Cir. 2015) (rejecting Nebraska's mootness argument without ever suggesting that state officials might defy *Obergefell*); *De Leon*, 791 F.3d at 625 (no suggestion that Texas officials might defy *Obergefell*); *Campaign for Southern Equality*, 791 F.3d at 627 (no suggestion that Mississippi officials might defy *Obergefell*). We know of at least one district-court decision that invoked the possibility of state defiance as a reason for rejecting mootness. *See Strawser v. Strange*, 190 F. Supp. 3d 1078, 1082 (S.D. Ala. 2016) (discussing then-Chief Justice Roy Moore's efforts to defy *Obergefell*). But that does nothing to distinguish the numerous appellate-court rulings that rejected mootness without mentioning or acknowledging the possibility of state defiance. Perhaps the *Danielson* court believed that those appellate-court rulings were

wrongly decided, but if that is true then the court should say so rather than distinguishing cases on a ground that played no role in those other courts' decisions.

The *Danielson* court also tried to distinguish the post-*Obergefell* cases by claiming that "*Janus* utilizes broad language in a lengthy discussion overturning precedent, unlike *Obergefell*, which at most summarily addresses conflicting precedent." *Danielson v. Inslee*, No. 3:18-cv-05206-RJB (W.D. Wash.), ECF No. 39 at 6. It is hard to see how this observation has any legal relevance. Both *Janus* and *Obergefell* overruled prior cases; the length of discussion and breadth of language has nothing to do with whether those rulings mooted ongoing litigation brought against similar laws in other States.

The opinion in *Yohn* tracks the reasoning of *Danielson* and relies on *Danielson*'s inadequate efforts to distinguish the post-*Obergefell* mootness rulings. *See Yohn v. California Teachers Ass'n*, No. 8:17-cv-00202-JLS-DFM (C.D. Cal.), ECF No. 198 at 5–7. And neither *Danielson* nor *Yohn* addresses *Hope Clinic v. Ryan*, 249 F.3d 603 (7th Cir. 2001) (en banc), which refused to moot a post-*Stenberg* challenge to Illinois's and Indiana's partial-birth abortion bans, or *Doe v. Kentucky ex rel. Tilley*, 283 F. Supp. 3d 608 (E.D. Ky. 2017), which refused to moot a post-*Packingham* challenge to a statute restricting the Internet activities of registered sex offenders.

### E. The Unions Cannot Establish Mootness By Relying On the State Defendants' Refusal To Enforce Agency Shops In Response To *Janus*

The unions offer a second argument against "voluntary cessation." They note that public employers have voluntarily halted the collection of representation fees in response to *Janus*, and they insist that unions are incapable of collecting these fees without the employer's co-operation. *See* ECF No. 75-1 at 9 ("The Union Defendants can collect representation fees only with the active assistance of the school district employers"). So the unions claim that they are boxed in by the school districts' independent decisions to stop diverting representation fees from their employees' paychecks, and that this precludes any finding of "voluntary" cessation on the part of the unions.

The problem with this argument is that it is simply untrue that unions are incapable of collecting dues and fees outside of payroll deductions. Unions can and do collect fees through ACH or credit-card payments, so long as they have an employee's bank or credit-card information on file. And the MSEA and its affiliates offer the option of credit-card payments. *See* Exhibit 1 (Education Association of Charles County offering employees the option of paying union fees by payroll deduction, check, or credit card); Exhibit 2 (MSEA offering retired employees the option of paying membership dues by pension deduction, check, or credit card). So any employee whose credit card is on file with the MSEA or its affiliates can be subjected to union fees without any involvement or cooperation from the school district. The unions must prove that they have no bank or credit-card information that would enable them to unilaterally resume collecting representation fees from non-members; they cannot ask this Court to assume facts that are not in evidence—especially at the Rule 12(b)(6) stage. *See Friends of the Earth, Inc. v. Laidlaw Environmental Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) ("The 'heavy burden of persua[ding]' the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness." (quoting *United States v. Concentrated Phosphate Export Assn.*, 393 U.S. 199, 203 (1968)).

## II. THE COURT CANNOT DISMISS THE REFUND CLAIMS AT THIS STAGE OF THE LITIGATION BASED ON THE SUPPOSED "GOOD-FAITH DEFENSE"

The unions do not deny that *Janus* is retroactive;[6] that they violated the plaintiffs' constitutional rights;[7] that they acted under color of state law when doing so;[8] and that they cannot assert a qualified-immunity defense.[9] *See* Dkt. No. 75-1 at 11–12. And it is impossible

---

6. *See Harper v. Virginia Dep't of Taxation*, 509 U.S. 86, 96 (1993) ("[A] rule of federal law, once announced and applied to the parties to the controversy, must be given full retroactive effect by all courts adjudicating federal law.").

7. *See Janus v. Am. Fed'n of State, Cty., & Mun. Employees, Council 31*, 138 S. Ct. 2448, 2478 (2018) ("[P]ublic-sector agency-shop arrangements violate the First Amendment, and *Abood* erred in concluding otherwise.").

8. *See Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982).

9. *See Wyatt v. Cole*, 504 U.S. 158, 167 (1992) ("[Q]ualified immunity for public officials [is] not applicable to private parties.").

to deny any of this without contradicting the binding precedent of the Supreme Court.[10] That makes the unions liable for a refund under the text of 42 U.S.C. § 1983, which imposes liability on any person who deprives another of his constitutional rights while acting under color of state law.[11]

The unions think that they escape the text of section 1983 by invoking a "good-faith defense" that appears nowhere in the statute and that has never been recognized by the Supreme Court or the Fourth Circuit. *See Wyatt v. Cole*, 504 U.S. 158, 168–69 (1992) (refusing to resolve whether private defendants can assert a "good faith" defense under section 1983). There are many problems with the union defendants' efforts to assert this so-called good-faith defense at this stage of this proceedings.

### A. *Wyatt v. Cole* Forbids A Good-Faith Defense When The Most Analogous Common-Law Tort Rejects Any Consideration Of The Tortfeasor's State Of Mind

The most serious problem for the unions is the Supreme Court's opinion in *Wyatt v. Cole*, which carefully explains the circumstances in which the courts may recognize non-textual defenses to section 1983. Whenever a defendant asserts a qualified-immunity or "good faith" defense, *Wyatt* compels courts to look to the most analogous common-law tort, and it allows courts to recognize a defense only if that tort would have conferred similar immunities when section 1983 was enacted:

> Section 1983 creates a species of tort liability that on its face admits of no immunities. Nonetheless, we have accorded certain government officials either absolute or qualified immunity from suit if the tradition of immunity was so firmly rooted in the common law and was supported by such strong policy reasons that Congress would have specifically so provided had it wished to

---

10. *See* notes 6–9, *supra*.

11. 42 U.S.C. § 1983 provides, in relevant part, that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ."

abolish the doctrine. If parties seeking immunity were shielded from tort liability when Congress enacted the Civil Rights Act of 1871—§ 1 of which is codified at 42 U.S.C. § 1983—we infer from legislative silence that Congress did not intend to abrogate such immunities when it imposed liability for actions taken under color of state law. . . . In determining whether there was an immunity at common law that Congress intended to incorporate in the Civil Rights Act, we look to the most closely analogous torts.

*Wyatt v. Cole*, 504 U.S. 158, 164 (1992) (citations and internal quotation marks omitted); *see also id.* at 170 (1992) (Kennedy, J., concurring) ("Our immunity doctrine is rooted in historical analogy, based on the existence of common-law rules in 1871, rather than in free-wheeling policy choices." (citation and internal quotation marks omitted); *id.* at 171–72 (1992) (Kennedy, J., concurring) ("[W]e may not transform what existed at common law based on our notions of policy or efficiency.").

The union defendants do not even address these passages in *Wyatt*—and for good reason. The most analogous common-law tort is conversion, and conversion is a strict-liability tort that is unconcerned with whether the defendant acted in good faith. *See Morissette v. U.S.*, 342 U.S. 246, 253–54 (1952) ("In the civil tort [of conversion], except for recovery of exemplary damages, the defendant's knowledge, intent, motive, mistake, and good faith are generally irrelevant. If one takes property which turns out to belong to another, his innocent intent will not shield him from making restitution or indemnity, for his well-meaning may not be allowed to deprive another of his own."); *Nickens v. Mount Vernon Realty Group, LLC,* 54 A.3d 742, 757 (Md. 2012) ("A defendant is liable nonetheless for conversion, if he, she, or it acted in good faith and lacked any consciousness of wrongdoing, as long as the act is an interference with the owner's control of the property." (internal quotation marks omitted)); Richard A. Epstein, Torts § 1.12.1 at 32 (1999) ("Liability for conversion is strict, for it is still maintainable when D has an honest belief that he owns the thing in question and thus is entitled to its exclusive use. Therefore, neither good faith nor bad faith, neither care nor negligence, neither knowledge nor ignorance are the gist of the action." (citation and internal quotation marks omitted)). When someone accidentally walks off with another's

property, or takes that property while believing in good faith that it rightly belongs him, he remains liable in tort to return the property or pay damages for its value. There is no "good faith" defense to the tort of conversion.

So unless the union defendants can show that the most analogous tort is something other than conversion, or unless they can show that the common-law tort of conversion incorporated a good-faith defense, they cannot assert a good-faith defense consistent with *Wyatt.* The union defendants do not attempt to make these showings in their motion to dismiss, and that alone is sufficient to defeat their good-faith defense.

The published court decisions on which the unions rely are readily distinguishable because they do not involve situations in which the most analogous common-law tort imposed strict liability. *See* ECF No. 75-1 at 13–14. In *Pinsky v. Duncan,* 79 F.3d 306, 312 (2d Cir. 1996), and *Wyatt v. Cole,* 994 F.2d 1113, 1118 (5th Cir. 1993), for example, the courts recognized that malicious prosecution was the most analogous common-law tort — a tort that required the plaintiff to prove that the defendant had acted with malice. *See Pinsky,* 79 F.3d at 312 ("Doehr's claim therefore falls within the definition of malicious prosecution. . . . We think that malicious prosecution is the most closely analogous tort"); *Wyatt,* 994 F.2d at 1118 ("The [Supreme] Court in *Wyatt* identified malicious prosecution and abuse of process as the common-law causes of action most analogous to Wyatt's claim under *Lugar* and therefore focused its inquiry on the elements of these torts."). These cases are no help at all to defendants who are attempting to assert a "good-faith defense" when the most analogous common-law tort is conversion or some other strict-liability tort.

*Jordan v. Fox, Rothschild, O'Brien & Frankel,* 20 F.3d 1250, 1276 (3d Cir. 1994), *Clement v. City of Glendale,* 518 F.3d 1090 (9th Cir. 2008), and *Williams v. Johnson,* 386 F. Supp. 280 (D. Md. 1974), involved deprivations of due-process rights rather than an unconstitutional confiscation of wages under the First Amendment — and the Supreme Court has held that the deprivation-of-due-process claims required plaintiffs to prove "gross negligence." *Jordan,* 20 F.3d at 1277–78. Nothing in *Jordan, Clement,* or *Williams* holds or

implies that a good-faith defense would be available when the most analogous common-law tort is conversion or some other strict-liability tort, and neither of these cases can be interpreted to confer a good-faith defense in those situations without contradicting what the Supreme Court said in *Wyatt*. *Vector Research, Inc. v. Howard & Howard Attorneys P.C.*, 76 F.3d 692, 698–99 (6th Cir. 1996), likewise did not involve a constitutional tort analogous to conversion.

Finally, the unpublished court rulings that allowed unions to assert "good faith" defenses in the aftermath of *Harris v. Quinn*, 134 S. Ct. 2618 (2014), are incompatible with *Wyatt*'s most-analogous-common-law-tort rule and cannot be followed. *See* Dkt. No. 75-1 at 14, 16, 18 (citing *Jarvis v. Cuomo*, 660 F. App'x 72, 75–76 (2d Cir. 2016); *Winner v. Rauner*, No. 15 CV 7213, 2016 WL 7374258, at **5–6 (N.D. Ill. Dec. 20, 2016); *Hoffman v. Inslee*, No. 14-CV-200 (MJP), 2016 WL 6126016 (W.D. Wash. Oct. 20, 2016)). None of those opinions attempts to explain how the most analogous common-law tort would allow for a good-faith defense, and none of them even acknowledges that *Wyatt* requires courts to consider the most analogous common-law tort before recognizing a non-textual immunity or defense under section 1983.

### B. The Union Defendants Misrepresent The Supreme Court's Opinions In *Wyatt v. Cole* and *Richardson v. McKnight*

The unions are wrong to say that the Supreme Court "suggested" the existence of a good-faith defense in *Wyatt v. Cole*, 504 U.S. 158 (1992), and *Richardson v. McKnight*, 521 U.S. 399 (1997). *See* ECF No. 75-1 at 13. *Wyatt* refused to resolve whether private parties can assert a "good-faith defense" to liability under section 1983, and the Supreme Court has never held or even stated in dictum that such a defense exists. *See* William Baude & Eugene Volokh, *Compelled Subsidies and the First Amendment*, 132 Harv. L. Rev. 171 (2018) ("[T]his good faith defense has never been endorsed by the Supreme Court, and there is little clear authority for it."). After holding in *Wyatt* that private defendants could not assert qualified immunity as a defense under section 1983, the Court wrote:

> [W]e do not foreclose the possibility that private defendants faced with § 1983 liability under *Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982), could be entitled to an affirmative defense based on good faith and/or probable cause or that § 1983 suits against private, rather than governmental, parties could require plaintiffs to carry additional burdens. *Because those issues are not fairly before us, however, we leave them for another day.*

*Wyatt v. Cole*, 504 U.S. 158, 169 (1992) (emphasis added). *Richardson* likewise made clear that the Supreme Court was remaining agnostic on whether a "good-faith defense" exists under section 1983. *See Richardson v. McKnight*, 521 U.S. 399, 414 (1997) ("*Wyatt* explicitly stated that it did not decide whether or not the private defendants before it might assert, not immunity, but a special 'good-faith' defense. . . . Like the Court in *Wyatt*, . . . we do not express a view on this . . . question.").

The union quotes *Wyatt* out of context with this carefully redacted excerpt on pages 12–13 of the union's brief: "The Court recognized that 'principles of equality and fairness may suggest . . . that private citizens . . . should have some protection from liability, as do their government counterparts[.]')" ECF No. 75-1 at 12–13 (all ellipses and alterations in union's brief). Here is full context of what the Court said:

> *Although* principles of equality and fairness may suggest, *as respondents argue*, that private citizens who rely unsuspectingly on state laws they did not create and may have no reason to believe are invalid should have some protection from liability, as do their government counterparts, *such interests are not sufficiently similar to the traditional purposes of qualified immunity to justify such an expansion.*

*Wyatt*, 504 U.S. at 168 (emphases added). The Court made this statement in the context of *rejecting* the defendants' efforts to expand qualified immunity to private individuals. The unions' selective quotation makes it appear as though the Court were endorsing the idea that private defendants should enjoy a defense that is co-extensive with qualified immunity. Instead, the Court was saying that appeals to "principles of equity and fairness" are *incapable* of justifying an extension of qualified immunity to private defendants—because this proposed extension of qualified immunity has no foundation in law.

### C. The Unions' Appeal To "Principles Of Equality And Fairness" Does Not Support A Good-Faith Defense For Public-Employee Unions

The unions repeatedly claim that it would be "unfair" to impose retroactive liability on section 1983 defendants, and they insist that "principles of equality and fairness" require public-employee unions to enjoy immunities similar to those available to its government counterparts. *See, e.g.*, ECF No. 75-1 at 12–13, 14 (quoting *Wyatt*, 504 U.S. at 168, and *Franklin v. Fox*, 2001 WL 114438, *5 (N.D. Cal.)). But the unions ignore the fact that many public employees work for counties and municipal corporations—and those entities are not permitted to assert qualified immunity or *any* type of immunity under 42 U.S.C. § 1983. *See Owen v. City of Independence*, 445 U.S. 622 (1980). Any county or municipal corporation that enforced an agency shop will have no immunity defense in a refund lawsuit, so the unions must explain why they should enjoy an immunity that is denied to counties or municipal corporations that established agency shops before *Janus*.

This leads to another problem with the union's equality-and-fairness argument: The qualified-immunity defense is available only to *individuals*, while *entities* such as counties and municipal corporations are categorically ineligible for the defense.[12] That is because qualified immunity is concerned with protecting individual officers from the threat of *personal* monetary liability for carrying out their duties—a concern that is not present when liability is imposed on entities such as municipal corporations or labor unions. As the Supreme Court has explained:

> At the heart of this justification for a qualified immunity for the individual official is the concern that the threat of *personal* monetary liability will introduce an unwarranted and unconscionable consideration into the decisionmaking process, thus paralyzing the governing official's decisiveness and distorting his judgment on matters of public policy. The inhibiting effect is significantly reduced, if not eliminated, however, when the threat of personal liability is removed.

---

12. State employers would likewise be ineligible for qualified immunity, but they cannot be sued under 42 U.S.C. § 1983 because they do not qualify as "persons." *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 64 (1989) ("[A] State is not a person within the meaning of [42 U.S.C. §] 1983.").

*Owen*, 445 U.S. at 655–56 (1980) (emphasis added). If the union wants to insist on a good-faith defense that mirrors the scope of qualified immunity, then this defense should extend only to the union's individual officers and employees; the union itself should remain liable on the same terms as a county or municipal entity.

The union's appeal to equality and fairness also runs headlong into *Wyatt*, which requires non-textual immunity defenses to section 1983 to be rooted in history and not policy considerations. *See Wyatt*, 504 U.S. at 164 ("In determining whether there was an immunity at common law that Congress intended to incorporate in the Civil Rights Act, we look to the most closely analogous torts—in this case, malicious prosecution and abuse of process."); *id*. at 170 (1992) (Kennedy, J., concurring) ("Our immunity doctrine is rooted in historical analogy, based on the existence of common-law rules in 1871, rather than in freewheeling policy choices." (citation and internal quotation marks omitted)); *id*. at 171–72 (1992) (Kennedy, J., concurring) ("[W]e may not transform what existed at common law based on our notions of policy or efficiency."). Courts cannot make up defenses to section 1983 based on notions of "equality and fairness"; any such defense must be grounded in historical analysis.

Finally, appeals to "fairness" are highly subjective, and for this reason they are not conducive to principled judicial decisionmaking. *See* 4 Phillip Areeda & Donald F. Turner, Antitrust Law 21 (1980) ("'[F]airness' is a vagrant claim applied to any value that one happens to favor."); Paul N. Cox, *Reflections on Ex Ante Compensation and Diversification of Risk As Fairness Justifications for Limiting Fiduciary Obligations of Corporate Officers, Directors, and Controlling Shareholders*, 60 Temp. L.Q. 47, 90 (1987) ("[F]airness is an empty concept given meaning only by reference to conceptions outside fairness."); *Anheuser-Busch, Inc. v. Local Union No. 744, Int'l Bhd. of Teamsters*, 280 F.3d 1133, 1148 (7th Cir. 2002) (Easterbrook, J., dissenting) ("Avoiding the 'f' word in both contemplation and exposition promotes clear thought and accurate decision."). The unions may believe that it is "unfair" for them to refund agency fees that were collected before the Supreme Court declared them

unconstitutional, but retroactive civil liability is ubiquitous in the law and is subjected only to rational-basis review. *See, e.g.*, *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1 (1976) (upholding retroactive civil liability in the Black Lung Benefits Act of 1972 after applying rational-basis review); *United States v. Monsanto Co.*, 858 F.2d 160, 173–75 (4th Cir. 1988) (upholding retroactive civil liability under CERCLA (Superfund)); *id.* at 174 (noting that other courts "have held uniformly that retroactive operation [of Superfund] survives the Supreme Court's tests for due process validity"); *Landgraf v. USI Film Products*, 511 U.S. 244, 267 (1994) ("[T]he potential unfairness of retroactive civil legislation is not a sufficient reason for a court to fail to give a statute its intended scope."); *Bank Markazi v. Peterson*, 136 S. Ct. 1310, 1325 (2016) ("[C]ongressional power to make valid statutes retroactively applicable to pending cases has often been recognized."); Noah Feldman, *Cosmopolitan Law?*, 116 Yale L.J. 1022, 1056 n.140 (2007) ("Following *Calder v. Bull*, 3 U.S. (3 Dall.) 386 (1798), retroactive civil liability has often been found not to violate the Ex Post Facto Clause or constitutional due process."). It is not at all apparent why it should be deemed "unfair" for the unions to refund pre-*Janus* agency fees when countless other entities face retroactive civil liability on account of new statutes and new court decisions, and when losing litigants often face liability for actions that they reasonably believed to be lawful at the time they made them. *See SEC v. Chenery Corp.*, 332 U.S. 194, 203 (1947) ("Every case of first impression has a retroactive effect, whether the new principle is announced by a court or by an administrative agency."). If anything, it would seem "unfair" to give the unions an immunity from retroactive liability that is unavailable to ordinary litigants.

The plaintiffs also have a compelling "fairness" argument in *support* of union liability: It is "unfair" for the unions to keep the money that they took in violation of the plaintiffs' constitutional rights, simply because the Supreme Court erroneously interpreted the Constitution in *Abood v. Detroit Board of Education,* 431 U.S. 209 (1977). Indeed, the Supreme Court has described the unions' pre-*Janus* receipt of agency fees as a "windfall," which suggests that the Supreme Court is unlikely to think it "unfair" for the unions to disgorge a

small portion of this 41-year "windfall" that they unconstitutionally received. *See Janus*, 138 S. Ct. at 2485–86 ("[W]e must weigh these disadvantages against the considerable windfall that unions have received under *Abood* for the past 41 years. It is hard to estimate how many billions of dollars have been taken from nonmembers and transferred to public-sector unions in violation of the First Amendment."). *Janus* also says that the unions were "on notice" that *Abood* could be overruled, which further undercuts the unions' claim that a refund of agency dues would be "unfair." *See Janus*, 138 S. Ct. at 2484–85 ("[P]ublic-sector unions have been on notice for years regarding this Court's misgivings about *Abood*. . . . During this period of time, any public-sector union seeking an agency-fee provision in a collective-bargaining agreement must have understood that the constitutionality of such a provision was uncertain."). All of this discussion from *Janus* is binding on this Court, and it is not apparent how a court can pronounce the plaintiffs' demand for a refund "unfair" while simultaneously respecting these statements in *Janus*.

D.   **Even If One Assumes That The Union Can Assert A Good-Faith Defense To A Conversion-Like Constitutional Tort, The Union Cannot Establish Good Faith Unless It Presents Evidence Of Its Officers' Subjective State Of Mind**

Because the union defendants cannot assert a good-faith defense when the most analogous common-law tort is conversion, the presence or absence of good faith is irrelevant to the union's liability under section 1983. But even if this Court were to conclude that the unions could assert a good-faith defense, the unions cannot prevail on that defense at this stage of the proceedings. "Good faith" is a subjective defense that requires evidence of a defendant's state of mind. *See, e.g., Wyatt v. Cole*, 994 F.2d 1113, 1120 (5th Cir. 1993) ("[W]e think that private defendants, at least those invoking ex parte prejudgment statutes, should not be held liable under § 1983 absent a showing of malice and evidence that they either knew or should have known of the statute's constitutional infirmity."); *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1277 (3d Cir. 1994) ("'[G]ood faith' gives state actors a defense that depends on their subjective state of mind, rather than the more

demanding objective standard of reasonable belief that governs qualified immunity."); *Robinson v. City of San Bernardino Police Dep't*, 992 F. Supp. 1198, 1207 (C.D. Cal. 1998) ("A good faith defense, unlike qualified immunity, depends on the subjective state of mind of the private person."); *Franklin v. Fox*, 2001 WL 114438, *5 (N.D. Cal.) ("[E]ven if an 'objective' private person in the defendant's position would not have known that the conduct was unconstitutional, the plaintiff still prevails if the defendant subjectively knew his conduct was unconstitutional.").

The unions have not presented any evidence regarding the subjective beliefs of their officers, and no such evidence can be considered on a motion to dismiss. *See Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993) ("We review here a decision granting a motion to dismiss, and therefore must accept as true all the factual allegations in the complaint."). That alone requires the Court to deny the unions' good-faith defense. *See* Fed. R. Civ. P. 12(b)(6). "Good faith" is an affirmative defense on which the union bears the burden of proof, and the union must raise this defense in its answer and present its evidence at trial or in a motion for summary judgment.

Dismissal at this stage is doubly improper because the plaintiffs have not had an opportunity to take discovery on the union's good faith. *See* Fed. R. Civ. P. 56(d). If discovery reveals that the union's officers expected *Janus* to overrule *Abood* and declare public-sector agency shops unconstitutional, then the union's determination to prolong these unconstitutional arrangements would not reflect a good-faith effort to comply with its constitutional obligations. It would instead reveal a determination to squeeze every last dollar from the plaintiffs and their fellow class members before the Supreme Court slammed the door. Discovery is needed before a court can determine whether the union has carried its burden of proof by showing subjective good faith by a preponderance of the evidence. *See Franklin v. Fox*, 2001 WL 114438, *5 (N.D. Cal.) ("A good faith defense . . . allows [plaintiffs] to conduct discovery of the subjective intent of the private defendant.").

Finally, the unions are flatly wrong to assert that the plaintiffs must plead an absence of good faith to avoid dismissal under Rule 12(b)(6). *See* ECF No. 75-1 at 15 ("At least in the absence of any allegations to the contrary—and the complaint contains none, *see* FAC ¶¶ 14-27—the presumption of statutory validity is sufficient to allow a defendant to argue that he acted in subjective good faith" (citation and internal quotation marks omitted)). A complaint is not required to anticipate or plead around affirmative defenses; this is among the most basic principles of federal civil procedure. *See Gomez v. Toledo*, 446 U.S. 635, 641 (1980) (holding that good faith is an affirmative defense that must be pleaded by the defendant because "whether such immunity has been established depends on facts peculiarly within the knowledge and control of the defendant."); *United States v. Northern Trust Co.*, 372 F.3d 886, 888 (7th Cir. 2004) (Easterbrook, J.) ("[C]omplaints need not anticipate and attempt to plead around defenses."). This union must assert this defense in its answer; it is not a ground for dismissal under Rule 12(b)(6).

### E. The Union Defendants' Reliance On Maryland's Agency-Shop Statutes Is Not A Defense To Liability Under 42 U.S.C. § 1983

Because the union defendants cannot assert a good-faith defense when the most analogous common-law tort is conversion, the unions' supposed reliance on Maryland law becomes irrelevant to their liability under section 1983. They cannot assert a good-faith defense regardless of whether they acted in accordance with a statutory enactment.

The union defendants wisely do not contend that their reliance on Maryland's unconstitutional statutes provides a freestanding defense to liability apart from their attempted "good faith" defense. Mistake of law is never a defense in civil litigation. *See* Richard S. Murphy, Erin A. O'Hara, *Mistake of Federal Criminal Law: A Study of Coalitions and Costly Information*, 5 Sup. Ct. Econ. Rev. 217, 276 (1997) ("Mistake of law plays a limited role in criminal law, but it never excuses civil liability."). So their reliance on Maryland law becomes relevant only if it can be folded into their good-faith defense—and the unions cannot assert *any* good-faith defense when the most analogous common-law tort is conversion.

In all events, even if one were to willing to allow the unions to assert a good-faith defense, the unions cannot establish that their reliance on Maryland's agency-shop laws was objectively reasonable. The Supreme Court had repeatedly warned the union defendants that it had grave misgivings about the constitutionality of public-sector agency shops long before declaring them unconstitutional in *Janus*. In 2012, the Supreme Court announced that its rulings upholding the constitutionality of public-sector agency shops were an "anomaly." *Knox v. Service Employees Int'l Union, Local 1000*, 567 U.S. 311 (2012). And *Harris v. Quinn*, 134 S. Ct. 2618 (2014), contained a lengthy discussion that sharply criticized *Abood v. Detroit Board of Education*, 431 U.S. 209 (1977), which had upheld the constitutionality of public-sector agency shops. *See id*. at 2632–34 (2014) (criticizing *Abood*'s analysis as "questionable on several grounds" and claiming that *Abood* "seriously erred" and "fundamentally misunderstood" the earlier decisions of the Court). And an eight-member Supreme Court deadlocked on whether to overrule *Abood* in *Friedrichs v. California Teachers Association*, 136 S. Ct. 1083 (2016). The unions have been on notice for at least six years that the constitutionality of public-sector agency shops was in doubt, and any reasonable observer knew (or should have known) that *Abood* was on thin ice.

Indeed, the Supreme Court specifically said in *Janus* that "public-sector unions have been on notice for years regarding this Court's misgivings about *Abood*" and that "any public-sector union seeking an agency-fee provision in a collective-bargaining agreement must have understood that the constitutionality of such a provision was uncertain." *Janus*, 138 S. Ct. at 2484, 2485. The Supreme Court made these statements in the context of discussing stare decisis, but the Court's observations are equally applicable (and equally binding) when considering the unions' attempted good-faith defense. In both situations, the relevant inquiry is whether the unions reasonably relied on *Abood* and the statutes that authorized agency shops in public employment. The Supreme Court answered that question "no"—and the lower courts must respect and follow that analysis when considering good-faith defenses asserted by unions seeking to escape liability for their constitutional violations.

The union defendants acknowledge that the Supreme Court warned them of the risks of relying on *Abood* in these pre-*Janus* decisions, but they claim that these warnings are "irrelevant" because the justices merely disparaged *Abood* and stopped short of explicitly overruling it. *See* Dkt. No. 75-1 at 16. A federal district court, however, does not have the option of writing off the Supreme Court's pronouncements as "irrelevant"—especially when the Supreme Court has said that the unions should *not* have relied on *Abood* given the Court's statements in *Knox* and *Harris*. *See Janus*, 138 S. Ct. at 2484–85. The union defendants are certainly correct to observe that *Knox* and *Harris* stopped short of overruling *Abood*, but that goes only to whether the unions were legally obligated to halt the collection of agency fees *before* the Supreme Court issued its ruling in *Janus*—and no one in this case is arguing that the union defendants were required to terminate their agency shops after *Knox* or *Harris*. The issue before the Court is whether the unions can keep the money that they took now that *Janus* has declared public-sector agency shops unconstitutional, and that depends on whether the unions can: (i) assert a good-faith defense under section 1983, and (ii) show that they reasonably relied on statutes and precedents that the Supreme Court had repeatedly called into question. The unions cannot make that showing when *Janus* says that the unions should not have relied on *Abood*.

More importantly, the unions knew (or should have known) that *Janus* would be retroactive,[13] and that *Wyatt v. Cole* would make any good-faith defense a tough sell when the most analogous common-law tort is conversion. *See Wyatt*, 504 U.S. at 164. Of course, the unions had every right to continue collecting agency fees in the hope that a *Janus*-like ruling might be averted or at least postponed—and if *Janus* had been decided the other way, the unions would have been allowed to keep the money. So it was perfectly sensible for the unions to continue taking agency fees notwithstanding the warnings from the Supreme

---

13. *See Harper v. Virginia Dep't of Taxation*, 509 U.S. 86, 96 (1993) ("[A] rule of federal law, once announced and applied to the parties to the controversy, must be given full retroactive effect by all courts adjudicating federal law.").

Court, and it would not have been prudent for them to halt the collection of those fees when there was at least a chance that the Supreme Court might stop short of issuing a *Janus*-like pronouncement. But that does not allow the unions to *keep* the money that they took in violation of the Constitution when the Supreme Court drops the other shoe. The unions collected these fees in full knowledge of the risk that they might have to be returned, and they cannot pretend that they relied on Maryland's agency-shop laws without knowledge of these risks.

F. **The Union Defendants Have Not Proven That They Complied With Pre-*Janus* Case Law**

There is yet another insurmountable obstacle to the union defendants' good-faith defense: They have not proven that their pre-*Janus* agency shops complied with the Supreme Court's pronouncement in *Abood v. Detroit Board of Education*, 431 U.S. 209, 239–40 (1977). The unions appear to believe that *Abood* gave them carte blanche to collect agency fees from non-union employees, but *Abood* imposed considerable limits on a public-employee union's ability to extract money from non-union members. Under *Abood*, public-employee unions could require non-members to pay only for union activities that were "germane" to collective bargaining, and they were strictly forbidden to apportion any "non-germane" expenditures to any of their agency-fee payers. *See Abood*, 431 U.S. at 235–36; *see also Otto v. Pa. State Educ. Ass'n–NEA*, 330 F.3d 125, 128 (3d Cir. 2003) ("[A] union may not, consistent with the First Amendment, collect fair-share dues [from non-members] to support ideological causes or other expenses insufficiently related to collective bargaining."). So the unions must show that they complied with *Abood* before they can establish a good-faith defense under section 1983; they cannot ask a court to assume compliance without presenting evidence.

And it will be a tall order for the unions to show that they complied with *Abood*. As *Janus* recognized, "*Abood*'s line between chargeable and nonchargeable union expenditures has proved to be impossible to draw with precision." *Janus*, 138 S. Ct. at 2481. And because

the unions are asserting good-faith as an affirmative defense, it is they who must bear the burden of establishing compliance with the admittedly hazy line between the "germane" and "non-germane" expenditures. *Cf. Abood*, 431 U.S. at 239–40 ("Since the unions possess the facts and records from which the proportion of political to total union expenditures can reasonably be calculated, basic considerations of fairness compel that they, not the individual employees, bear the burden of proving such proportion."). In all events, this is a detailed factual question that cannot be proven in a motion to dismiss under Rule 12(b)(6).

### G. The Union's Good-Faith Defense Does Not Confer Immunity From Recovery For Restitution And Unjust Enrichment

The union defendants repeatedly describe their "good-faith defense" as a defense from liability for "damages." Dkt. No. 75-1 at 2, 6, 11, 12, 13. But the plaintiffs have sued for a refund of money—which can be characterized as an equitable claim for restitution or unjust enrichment rather than damages. *See* First Amended Complaint at ¶ 53(d). Indeed, the plaintiffs were careful to avoid the word "damages" in their demand for relief, so that their refund request could be characterized as an equitable demand for monetary relief if needed to escape an immunity defense under section 1983.

The union defendants cite no authority suggesting that their supposed "good faith" defense should extend to an equitable demand for restitution. The defendants bear the burden of showing that this affirmative defense extends beyond mere claims for damages, and they presented no argument or authorities to this effect. Qualified immunity does not shield defendants from any type of equitable relief. *See Wood v. Strickland*, 420 U.S. 308, 315 n.6 (1975), *overruled in part on other grounds, Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ("[I]mmunity from damages does not ordinarily bar equitable relief as well."). It is hard to understand why the rules should be different for those who assert a "good faith" defense.

III.  **The Plaintiffs Have Stated A Claim For A Refund Under State Law**

The plaintiffs have accused the union defendants of garnishing their wages without lawful authorization. *See* First Amended Complaint ¶ 25, 51. That unquestionably states a claim for relief under Maryland law. The Maryland Court of Appeals has specifically held that the wrongful deprivation of wages qualifies as "conversion." *See Keys v. Chrysler Credit Corp.*, 494 A.2d 200, 209 (Md. 1985) ("Appellant suffered loss of the use of a part of her wages for more than a week . . . . [T]he evidence was sufficient to permit the jury to find an interference of sufficient seriousness to amount to a conversion."). And no jurisdiction permits employers or third-party entities to tap an employee's paycheck without the employee's consent or without lawful justification.[14]

The unions' claim that there was no "wrongful" deprivation of the plaintiffs' wages runs headlong into the fact that *Janus* is retroactive. *See Harper*, 509 U.S. at 96. The unions certainly *believed* that they were acting with lawful justification at the time they took the money, but *Janus* retroactively changed the legality of what they did. The unions cannot deny that their confiscation of the plaintiffs' wages was "wrongful" unless they are prepared to contend that *Janus* is not retroactive — and they present no argument for that in their brief.

Nor can the unions defend their tortious behavior by relying on the statutes that authorized public-sector agency shops, because those statutes are unconstitutional and unconstitutional statutes cannot provide a defense to a state-law tort claim. *See Norton v. Shelby County*, 118 U.S. 425, 442 (1886) ("[A]n unconstitutional act is not a law; it confers no rights; it

---

14. The unions are wrong to assert that the complaint "seeks only declaratory relief" on these state-law claims. *See* ECF No. 75-1 at 18. The first amended complaint demands that the union defendants "repay all 'agency fees' or 'representation fees' or other money that they unconstitutionally took from Ms. Akers and her fellow class members." *See* First Amended Complaint ¶ 53(e). The plaintiffs have both federal and state-law remedies to recover the money that was taken in violation of their constitutional rights, and they are demanding a refund of that money under both federal and state law.

imposes no duties; it affords no protection; it creates no office; it is, in legal contemplation, as inoperative as though it had never been passed."); *Chicago, Indianapolis, & Louisville Ry. Co. v. Hackett*, 228 U.S. 559, 566 (1913) ("[A]n unconstitutional act is not a law, and can neither confer a right or immunity nor operate to supersede any existing valid law.").

Finally, Maryland law specifically allows conversion claims for money whenever a defendant converts "specific segregated or identifiable funds." *Sage Title Grp., LLC v. Roman*, 166 A.3d 1026, 1035 (Md. 2017) (quoting *Allied Inv. Corp. v. Jasen*, 731 A.2d 957, 966 (Md. 1999)). That is precisely what the unions have done: They have taken "specific segregated or identifiable funds" that were supposed to be paid to the plaintiffs but were instead diverted from their paychecks. The unions do not deny any of this; they contend only that they have failed to *maintain* the plaintiffs' money in "segregated or identifiable" *after* converting it. *See* ECF No. 75-1 at 21 ("Plaintiffs have not alleged that MSEA or the local education associations maintained the representation fees they paid as separate identifiable funds. . . . That comingling of funds deprived Plaintiffs of any claim to identifiable property."). But Maryland law is concerned only with whether the converted money was "segregated or identifiable" *at the time of conversion*—and it clearly was, as it had been earmarked as wages for the plaintiffs and their fellow class members. This is consistent with the Maryland Court of Appeals' decision in *Keys*, which held that the wrongful deprivation of wages constitutes a "conversion"— regardless of what the defendant subsequently does with that money. *See Keys v. Chrysler Credit Corp.*, 494 A.2d 200, 209 (Md. 1985) ("Appellant suffered loss of the use of a part of her wages for more than a week . . . . [T]he evidence was sufficient to permit the jury to find an interference of sufficient seriousness to amount to a conversion."). The unions' claim that the plaintiffs must have had "actual or constructive possession of the chattel at the time of the alleged conversion" is irreconcilable with *Keys* and unsupported by any Maryland authority. *See* ECF No. 75-1 at 21. And the unions' suggestion that the tort of conversion incorporates a good-faith defense is meritless. Maryland law makes clear that conversion is a strict-liability tort, and that "good faith" is no defense. *See Darcars Motors of Silver Spring,*

*Inc. v. Borzym*, 841 A.2d 828, 836 (Md. 2004) ("The defendant may have the requisite intent *even though he or she acted in good faith* and lacked any consciousness of wrongdoing, as long as there was an intent to exert control over the property." (emphasis added)); *Nickens v. Mount Vernon Realty Group, LLC,* 54 A.3d 742, 757 (Md. 2012) ("A defendant is liable nonetheless for conversion, *if he, she, or it acted in good faith and lacked any consciousness of wrongdoing*, as long as the act is an interference with the owner's control of the property." (emphasis added) (internal quotation marks omitted)).

In all events, even if the unions could somehow defeat the plaintiffs' conversion claims, that does not warrant dismissal of the state-law claims because the plaintiffs are seeking relief "under the state-law torts of conversion, trover, detinue, trespass to chattels, *and any other state-law cause of action that offers relief* for this unlawful seizure of [their] personal property." First Amended Complaint ¶ 51 (emphasis added). The unions must show that there is *no* available remedy under Maryland law when an employee's wages are garnished without lawful authorization, including equitable remedies such as restitution and unjust enrichment. The unions have not attempted to make this showing in their brief.

## IV. The Plaintiffs Have Standing To Seek Relief Against the Enforcement Of House Bill 811, And They Have Stated A Claim Against The Statute's Enforcement

The unions claim that the plaintiffs lack standing to challenge to House Bill 811 and that they have failed to state a claim on which relief may be granted. We will address each objection in turn.

### A. The Plaintiffs Have Standing To Challenge To House Bill 811

The unions say that they already have the plaintiffs' home addresses, home phone numbers, and personal cell-phone numbers, and that the plaintiffs therefore lack standing to seek relief against the compelled-disclosure requirements in HB 811. *See* ECF No. 75-1 at 24–26. But the plaintiffs continue to suffer "injury in fact" because HB 811 requires the school to disclose their personal contact information to the union every 120 days, which prevents

them from changing their home-phone or cell-phone numbers and keeping those new phone numbers from the union. The plaintiffs can also request an injunction that would require the union to delete and destroy data or files that contain their personal contact information. This is more than enough to establish an Article III case or controversy between the parties. *See Knox v. Service Employees Int'l Union, Local 1000*, 132 S. Ct. 2277, 2287 (2012) ("A case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party.").

The unions dismiss the plaintiffs' inability to change their phone numbers and keep them from the union as a "theoretical future harm," but the statute is inflicting present-day injury on the plaintiffs because they are *currently* disabled from changing their phone numbers and keeping their phone new numbers from the union. The unions fault the plaintiffs for failing to allege that they "intend" to change their phone numbers, but any such action would be useless until a court enjoins the enforcement of HB 811. And in all events, there is nothing wrong with seeking judicial relief against an alleged future injury that might or might not occur—so long as judicial relief would reduce the *probability* of that adverse future event. *See Massachusetts v. EPA*, 549 U.S. 497, 525 n.23 (2007) ("[E]ven a small probability of injury is sufficient to create a case or controversy—to take a suit out of the category of the hypothetical—provided of course that the relief sought would, if granted, reduce the probability" (citation and internal quotation marks omitted)); *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 155 (2010) (conferring standing on conventional alfalfa farmers to challenge an agency action that gave rise to a "significant risk of gene flow to non-genetically-engineered varieties of alfalfa."); *Mountain States Legal Foundation v. Glickman*, 92 F.3d 1228, 1234–35 (D.C. Cir. 1996) (conferring standing to challenge the government's decision to limit timber harvesting based on the increased risk of wildfires).

The plaintiffs' injuries can also be redressed by an injunction that requires the union to delete and destroy the data or files containing the plaintiffs' personal contact information. Although the First Amended Complaint does not specifically demand an injunction of that

sort, it is fairly encompassed within the request for "all other relief that the Court may deem just, proper, and equitable." *See* First Amended Complaint ¶ 54(f); *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2307 (2016) (a request in the complaint to issue "such other and further relief as the Court may deem just, proper, and equitable" is sufficient to preserve relief that is not specifically requested in the pleadings). The unions do not deny that relief of this sort would redress the plaintiffs' injuries.

**B.    The Plaintiffs Have Stated A Claim Against The Enforcement Of House Bill 811**

Ms. Akers's constitutional argument rests on the following syllogism: (1) HB 811's compelled-disclosure provisions are subject to "exacting scrutiny"; (2) The compelled disclosure of an employee's home address, home phone number, and personal cell-phone number cannot survive "exacting scrutiny" because a union does not need this information to communicate with the employees that it represents; (3) Therefore, HB 811's compelled-disclosure requirements are unconstitutional as applied to employees who have not consented to the disclosure of their personal contact information. The unions contest the major premise and the minor premise of this argument.

**1.    HB 811's Compelled-Disclosure Requirements Are Subject To "Exacting Scrutiny"**

The unions claim that "exacting scrutiny" cannot apply because the compelled disclosures "reveal[ ] nothing about [the plaintiffs'] associations and beliefs." ECF No. 75-1 at 27. But the Supreme Court has never held that its "exacting scrutiny" standard is limited to compelled disclosures that directly reveal an individual's associations or beliefs—and the union does not cite any case that refused to apply "exacting scrutiny" because the challenged disclosure failed to reveal information of this sort. Instead, the union relies only on the brute fact that the cases that applied "exacting scrutiny" happened to involve disclosures of an individual's political associations or beliefs, and it uses that to infer that the "exacting scrutiny" standard must therefore be limited to compelled disclosures of that particular type.

That is a non-sequitur. To determine whether "exacting scrutiny" applies, one looks not to the facts of individual cases but to the Supreme Court's *rationale* for subjecting compelled disclosures to First Amendment scrutiny. And the Supreme Court has made clear that compelled disclosures trigger heightened review when they have the effect of deterring others from engaging in First Amendment activities. *See NAACP v. Alabama*, 357 US 449, 463 (1958) (refusing to allow the compelled disclosure of the NAACP's membership list because such disclosure "may induce members to withdraw from the Association and dissuade others from joining it"); *id.* (acknowledging "the deterrent effect which . . . these disclosures may well have on the free exercise by petitioner's members of their constitutionally protected right of association"); *Brown v. Socialist Workers '74 Campaign Comm.*, 459 U.S. 87, 97 (1982) (refusing to allow the compelled disclosure of the Socialist Workers Party's campaign contributors because "such an individual may well be deterred from providing services by even a small risk of harassment"). A law that compels school employers to hand over their employees' personal contact information to the union will have the undeniable effect of deterring those employees from engaging in anti-union speech. That does not necessarily make the law unconstitutional, but it does require a court to subject the law to "exacting" First Amendment scrutiny.

The union faults the plaintiffs for failing to provide factual allegations in their complaint that explain how HB 811's compelled disclosures will deter anti-union speech. *See* ECF No. 75-1 at 28. But complaints are not required to plead facts, and conclusory allegations are perfectly acceptable under a notice-pleading regime. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002) ("Federal Rule of Civil Procedure 8(a)(2) . . . provides that a complaint must include only 'a short and plain statement of the claim showing that the pleader is entitled to relief.' Such a statement must simply give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." (citation and internal quotation marks omitted)). If the unions doubt the factual premises of the plaintiffs' First Amendment argument, then they should answer the complaint and move for summary judgment; they

cannot dismiss a claim at Rule 12(b)(6) on the ground that it lacks factual support. *See Swierkiewicz*, 534 U.S. at 512 ("This simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims."). And if the unions think the complaint should provide more factual detail, then they should ask for a more definite statement under Rule 12(e) rather than moving to dismiss. *See id*. at 514 ("If a pleading fails to specify the allegations in a manner that provides sufficient notice, a defendant can move for a more definite statement under Rule 12(e) before responding.").

> **2.** **The Compelled Disclosure Of Anti-Union Employees' Home Addresses, Home Phone Numbers, And Personal Cell-Phone Numbers Cannot Survive "Exacting Scrutiny" Because It Remains Possible To Establish Equally Effective Channels Of Communication Without Forcing Schools To Disclose This Personal Contact Information**

HB 811's compelled disclosures cannot survive exacting scrutiny because there are equally effective ways to establish communication channels between a union and school employees that do not force the disclosure of anti-union employees' personal contact information. And because these equally effective alternatives remain available to the State, the compelled disclosure of anti-union employees' personal contact information cannot survive any formulation of "exacting scrutiny."

The unions contend that the compelled-disclosure regime facilitates communication between the union and school employees. *See* ECF No. 75-1 at 30–32. And the union's defense of HB 811 would easily survive rational-basis scrutiny or other forms of review that do not require a clear fit between ends and means. *See, e.g., Trump v. Hawaii*, 138 S. Ct. 2392, 2420–21 (2018) (laws will survive rational-basis review so long as it remains possible to discern a relationship to legitimate state interests). But the problem with HB 811 is that it remains possible to create equally effective avenues of communication without forcing the

disclosure of anti-union employees' home addresses, home phone numbers, and personal cell-phone numbers.

The unions note that most school employees work only ten months per year and may not check their work mailboxes, work voicemail, and work e-mail accounts during the summer months. But it is not necessary to force the disclosure of every employee's home addresses, home phone number, and personal cell-phone number to address this problem. Instead, school employees could be given a choice. They could either: (1) allow the school to disclose their personal contact information to the union; or (2) take steps to ensure that their work mail will be forwarded to their home, their work phone calls will be redirected to their personal cell phone, and their work e-mails will be forwarded to an e-mail account that they use during summer months. It is easy and inexpensive to set up forwarding mechanisms of this sort, and school employees should at least be allowed to choose whether to make these arrangements before having their personal contact information disclosed to a union that they oppose.

The union's desire to avoid school-sponsored media when sending confidential communications is likewise insufficient to justify the compelled disclosure of every single employee's home addresses, home phone number, and personal cell-phone number. Anti-union employees who do not want the union to have their personal contact information should have the option of setting up their own communications channel for the union to use if the union wants to avoid school-sponsored media. A school employee who wants to protect her privacy, for example, could ask the union to send mail communications to a post office box or a third-party entity that holds the employee's home address but keeps the address from the union. Unions have used third-party entities of this sort to send mail to employees that they represent, and it obviates the need for unions to hold the home addresses of public-sector employees. *See County of Los Angeles v. Los Angeles County Employee Relations Comm'n.*, 301 P.3d 1102, 1006 (Cal. 2013) (noting that the County of Los Angeles has "has never given

SEIU home addresses or telephone numbers" of its employees, and that the SEIU has delivered its mail communications "to the Los Angeles County Employee Relations Commission (ERCOM), an independent body that manages relations between the County and its employees," and that ERCOM would mail the materials directly to the employee). The same is true for phone and e-mail communications: The employee should have the option of establishing a virtual phone number or a separate e-mail account for the union to use—which protects the employee's privacy and allows him to quickly change or terminate the alternative phone number or e-mail address if they are publicly released or fall into the wrong hands.

The most troubling aspect of HB 811's compelled-disclosure regime is that it makes no exceptions or allowances for *anyone*—not even for employees whose lives could be endangered if their personal contact information fell into the wrong hands. Other States have recognized the need to protect victims of stalking or domestic violence when requiring employers to hand over employees' personal contact information to a union. *See, e.g.*, Cal. Gov't Code § 6207 (protecting the privacy of victims of domestic violence, sexual assault, and stalking); Cal. Gov't Code § 6254.3 (a)(3) (protecting the home addresses and phone numbers of employees performing law-enforcement functions). And California allows any public employee to opt out of having his employer disclose his home address, home and personal cellphone numbers, and personal e-mail address to a union. *See* Cal. Gov't Code § 6254.3(c). Of course, the mere fact that other States have accommodated their employees' privacy concerns does not mean that Maryland is constitutionally compelled to do the same, but it does undercut the union's contention that it must have the personal contact information of every single school employee in order to communicate effectively with the members of a bargaining unit.

This is more than enough to survive a motion to dismiss under Rule 12(b)(6). The plaintiffs do not need to prove that HB 811 is unconstitutional at the motion-to-dismiss stage; they need only to *allege* that it is, and the unions' defense of HB 811 turns on factual

contentions that cannot be considered at this stage of the litigation. Whether HB 811 actually can survive exacting scrutiny (or some other standard that the union seeks to apply) is a matter to be resolved on summary judgment after the development of a factual record.

## V. The Plaintiffs' Constitutional Challenges To Exclusive Representation Should Be Dismissed Given The Supreme Court's Holding In Knight

The union defendants correctly note that *Knight v. Minnesota Community College Faculty Association*, 460 U.S. 1048 (1983), summarily affirmed a district court's rejection of a constitutional challenge to exclusive representation in public-sector employment. The unions are also correct to observe that *Minnesota State Board for Community Colleges v. Knight*, 465 U.S. 271 (1984), rejected First Amendment challenges to other features of Minnesota's exclusive-representation regime. *See* ECF No. 75-1 at 36–37. Although there is language in *Janus* that suggests that the Supreme Court might be open to reconsidering the constitutionality of exclusive representation in the public sector,[15] we agree with the unions that these statements are insufficient to authorize a federal district court to depart from the Court's previous holdings in *Knight*. *See Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."). The plaintiffs brought this First Amendment challenge to seek reconsideration of *Knight*, but they cannot pursue this claim until the case arrives at the Supreme Court.

The Court should therefore dismiss the First Amendment challenge to exclusive representation and allow the plaintiffs to pursue this claim if and when their case reaches the Supreme Court. The Court should be aware that the plaintiffs in *Bierman v. Dayton*, 900 F.3d

---

15. *See Janus*, 138 S. Ct. at 2460 ("Designating a union as the employees' exclusive representative substantially restricts the rights of individual employees."); *id*. at 2478 ("It is also not disputed that the State may require that a union serve as exclusive bargaining agent for its employees — itself a significant impingement on associational freedoms that would not be tolerated in other contexts.").

570 (8th Cir. 2018), are seeking certiorari on their constitutional challenge to exclusive representation, and if the Supreme Court grants certiorari in *Bierman* the plaintiffs may seek to reopen their constitutional claim.

## VI.   Ms. Moesel Has Stated An Antitrust Claim

The union defendants do not deny that the plaintiffs have alleged anticompetitive behavior, but they try to defeat the plaintiffs' claims by invoking three *defenses* to the antitrust laws. *See* ECF No. 40–44 (invoking the state-action doctrine, the *Noerr-Pennington* doctrine, and the statutory labor exception). Defenses of this sort are not grounds for dismissal under Rule 12(b)(6). *See Cost Mgmt. Servs., Inc. v. Washington Nat. Gas Co.*, 99 F.3d 937, 943 (9th Cir. 1996) ("[T]he question of whether a state has 'actively supervised' a state regulatory policy is a factual one which is inappropriately resolved in the context of a motion to dismiss."); *Waugh Chapel South, LLC v. United Food and Commercial Workers Union Local 27*, 728 F.3d 354, 360 (4th Cir. 2013) (vacating district court's "purported . . . adjudicat[ion] of the unions' *Noerr-Pennington* defense under Rule 12(b)(6), which is a procedure that tests only the sufficiency of a complaint and 'cannot reach the merits of an affirmative defense. . . .'"); *United States. v. Northern Trust Co.*, 372 F.3d 886, 888 (7th Cir. 2004) (Easterbrook, J.) ("A complaint states a claim on which relief may be granted whether or not some defense is potentially available. . . . Resolving defenses comes after the complaint stage."). The only way that a *defense* can support dismissal under Rule 12(b)(6) is when the plaintiffs have pleaded themselves out of court, and the unions make no claim that the plaintiffs have done so. For these and other reasons, none of these asserted defenses can support dismissal at this stage of the litigation.

### A.   The State-Action Immunity Doctrine Cannot Support Dismissal Under Rule 12(b)(6)

The Supreme Court has held in three of its recent decisions that the state-action immunity defense is "disfavored." *See N.C. State Bd. of Dental Examiners v. FTC*, 135 S. Ct. 1101, 1110 (2015); *FTC v. Phoebe Putney Health Sys., Inc.*, 568 U.S. 216, 225 (2013); *FTC v.*

*Ticor Title Ins. Co.,* 504 U.S. 621, 636 (1992). When the Supreme Court announces on three separate occasions that a defense to antitrust liability is "disfavored," then the courts should not allow that defense unless the precedents of the Supreme Court clearly and unambiguously support a finding of state-action immunity. The unions do not acknowledge the Supreme Court's repeated statements casting "disfavor" on the state-action immunity doctrine, but their arguments must be examined through the lens of the Supreme Court's statements disfavoring the state-action immunity doctrine, and any doubts or uncertainties involving the scope of this defense should be resolved in the plaintiffs' favor.

To establish a state-action immunity defense, the unions must make two showings: "[F]irst that 'the challenged restraint . . . be one clearly articulated and affirmatively expressed as state policy, and second that the policy . . . be actively supervised by the State." *N.C. State Bd. of Dental Examiners*, 135 S. Ct. at 1110. But nothing in the plaintiffs' complaint concedes that the unions' insistence on uniform salaries for teachers regardless of subject matter has been "clearly articulated and affirmatively expressed as state policy," and nothing in the complaint concedes this with respect to the low salaries that union-negotiated contracts establish for entry-level teachers and lateral hires. *See* First Amended Complaint ¶ 46–47. Nor is there *anything* in the plaintiffs' complaint that acknowledges "active supervision" by the State, and the unions' brief says nary a word about this equally necessary requirement to establish state-action immunity.

None of this is to say that the unions will be unable to establish state-action immunity at a later date, but they have no hope of prevailing on this defense at the Rule 12(b)(6) stage when they ignore the "active supervision" requirement and when the complaint says nothing that admits the elements of a state-action defense. *See Cost Mgmt. Servs., Inc.*, 99 F.3d at 943 ("[T]he question of whether a state has 'actively supervised' a state regulatory policy is a factual one which is inappropriately resolved in the context of a motion to dismiss.").

### B. The *Noerr-Pennington* Doctrine Cannot Support Dismissal Under Rule 12(b)(6)

The *Noerr-Pennington* doctrine, like the state-action-immunity doctrine, is an affirmative defense that cannot be asserted at the Rule 12(b)(6) stage unless a plaintiff has pleaded itself out of court. *See Waugh Chapel South, LLC v. United Food and Commercial Workers Union Local 27*, 728 F.3d 354, 360 (4th Cir. 2013) (vacating district court's "purported . . . adjudicat[ion] of the unions' *Noerr-Pennington* defense under Rule 12(b)(6), which is a procedure that tests only the sufficiency of a complaint and 'cannot reach the merits of an affirmative defense. . . .'"). That alone requires the Court to deny the unions' motion to dismiss on *Noerr-Pennington* grounds. In all events, the unions grossly overstate the scope of *Noerr-Pennington* immunity.

The unions contend that *all* collective bargaining in the public sector is protected by *Noerr-Pennington* immunity, but this notion cannot be squared with the Supreme Court's ruling in *Mine Workers v. Pennington*, 381 U.S. 657, 670 (1965), which established the eponymous *Noerr-Pennington* doctrine:

> This is not to say that an agreement resulting from union-employer negotiations is automatically exempt from Sherman Act scrutiny simply because the negotiations involve a compulsory subject of bargaining . . . . [T]here are limits to what a union or an employer may offer or extract in the name of wages, and because they must bargain does not mean that the agreement reached may disregard other laws."

*Pennington*, 381 U.S. at 664–65. And the unions cite *no* cases or authorities that have held that public-sector collective-bargaining agreements are categorically protected by *Noerr-Pennington*. The unions provocatively suggest that *Janus* implicitly expanded the scope of *Noerr-Pennington* immunity when it declared that all public-sector collective bargaining is inherently political and ideological,[16] but lower courts must adhere to the Supreme Court's existing pronouncements on *Noerr-Pennington* unless and until the justices decide to revisit them. *See Rodriguez de Quijas*, 490 U.S. at 484 ("If a precedent of this Court has direct

---

16. *See* ECF No. 75-1 at 43–44.

application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.").

### C.     The Statutory Labor Exemption Cannot Support Dismissal Under Rule 12(b)(6)

Section 6 of the Clayton Act provides:

> The labor of a human being is not a commodity or article of commerce. Nothing contained in the antitrust laws shall be construed to forbid the existence and operation of labor, agricultural, or horticultural organizations, instituted for the purposes of mutual help, and not having capital stock or conducted for profit, or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the antitrust laws.

15 U.S.C. § 17. None of Ms. Moesel's antitrust claims contradict the language of this provision. Ms. Moesel is not challenging the "existence and operation" of the unions, nor is she seeking to declare unions or their members to be "illegal combinations or conspiracies in restraint of trade." *Id.* She is challenging specific provisions in the unions' *collective-bargaining agreements* that: (1) mandate uniform salaries for teachers regardless of the subjects that they teacher; (2) mandate exceedingly low salaries for entry-level teachers or lateral hires; and (3) forbid school districts to negotiate with teachers outside the terms of the union-negotiated collective-bargaining agreement. Nothing in the statutory labor exemption purports to protect a union's status as an exclusive representative, and nothing purports to shield the terms of a union-negotiated collective-bargaining agreement. Indeed, the entire need for the *non-statutory* labor exemption arose because the statutory labor exemption failed to shield unions from the types of activities that Ms. Moesel is challenging here. *See Brown v. Pro Football Inc.*, 518 U.S. 231, 236–37 (1996). Finally, the mere observation that the labor of a human being is "not a commodity or article of commerce" does not confer immunity when a collective-bargaining agreement restrains trade in violation of the rule of reason. *See* 15

U.S.C. § 1 (outlawing every "contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce").

## CONCLUSION

The union defendants' motion to dismiss should be granted with respect to the plaintiffs' constitutional challenge to exclusive representation, but denied in all other respects.

Respectfully submitted.

JONATHAN F. MITCHELL*
Mitchell Law PLLC
106 East Sixth StreetSuite 900
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3940 (fax)
jonathan@mitchell.law

\* admitted *pro hac vice*

Dated: November 21, 2018

 /s/ Rada A. Machin 
RADA A. MACHIN
D. Md. Bar No. 20076
The Machin Law Firm, LLC
One Research Court, Suite 450
Rockville, Maryland 20850
(301) 731-2000 (phone)
(301) 731-2000 (fax)
rada@machinlawfirm.com

*Counsel for Plaintiffs and
the Proposed Class*

# CERTIFICATE OF SERVICE

I certify that on November 21, 2018, I served this document through the Court's CM/ECF system upon:

John West
Leon Dayan
Bruce R. Lerner
Jacob Karabell
Adam Bellotti
Bredhoff & Kaiser PLLC
805 15th Street NW
Washington, D.C. 20005
(202) 842-2600
jwest@bredhoff.com
ldayan@bredhoff.com
blerner@bredhoff.com
jkarabell@bredhoff.com
ldayan@bredhoff.com

Kristy K. Anderson
Maryland State Education Association
140 Main Street
Annapolis, Maryland 21401
(443) 433-3665
kanderson@mseanea.org

Lubna A. Alam
National Education Association
1201 16th Street NW, 8th Floor
Washington, DC 20036
(202) 833-4000
lalam@nea.org

*Counsel for Union Defendants*

Adam Dean Snyder
Office of the Attorney General
Division of Opinions & Advice
200 St. Paul Place
20th Floor
Baltimore, Maryland 21202
(410) 576-6398
asnyder@oag.state.md.us

Ryan Robert Dietrich
Office of the Attorney General
200 St. Paul Place
Baltimore, Maryland 21202
(410) 576-7648
rdietrich@oag.state.md.us

*Counsel for State Defendants*

Edmund J. O'Meally
Adam E. Konstas
Pessin Katz Law, P.A.
901 Dulaney Valley Road, Suite 500
Towson, Maryland 21204
(410) 339-6757
(410) 339-5786
eomeally@pklaw.com
akonstas@pklaw.com

Margaret-Ann Frances Howie
Baltimore County Public Schools
6901 Charles Street
Towson, Maryland 21204
(443) 809-4060
mhowie@bcps.org

*Counsel for Defendant Verletta White*

(additional counsel listed on following page)

B. Darren Burns
Carney, Kelehan, Bresler, Bennett &
Scherr, LLP
1997 Annapolis Exchange Parkway
Suite 300
Annapolis, Maryland 21401
(410) 573-2001
bdb@carneykelehan.com

*Counsel for Defendant George Arlotto*

 /s/ Rada A. Machin
Rada A. Machin
*Counsel for Plaintiffs and Proposed Classes*